FACER *v.* LEWIS.

1. PHYSICIANS AND SURGEONS—X-RAY—STANDARD OF CARE.

The standard of care, skill, and diligence required of an X-ray operator is not fixed by the *ipse dixit* of an expert, but by the care, skill, and diligence ordinarily possessed and exercised by others in the same line of practice and work in similar localities.

2. NEGLIGENCE—RES IPSA LOQUITUR.

The doctrine of *res ipsa loquitur* is not recognized in this State.

3. PHYSICIANS AND SURGEONS—X-RAY BURNS—BURDEN OF PROOF.

Party claiming damages because of X-ray burns has the burden of showing such burns were occasioned by an overexposure and that such happened because defendant failed to exercise the reasonable and ordinary care, skill and diligence possessed by others in the same line of practice and work in similar localities.

4. SAME—X-RAYS—EXPERT TESTIMONY—BASIS OF QUESTION FOR JURY.

The proper or improper use of X-rays is a matter requiring the testimony of experts; hence the testimony of a lay witness as to how defendant gave X-ray treatment to father of the witness did not establish a basis upon which a jury might find defendant negligent in treatment of warts on father's foot.

Appeal from Oakland; Hartrick (George B.), J. Submitted October 6, 1949. (Docket No. 36, Calendar No. 42,530.) Decided January 9, 1950.

REFERENCES FOR POINTS IN HEADNOTES

[1] 41 Am Jur, Physicians and Surgeons, § 89.
[1, 3, 4] Liability for injury by X-ray. 13 ALR 1414; 26 ALR 732; 57 ALR 268; 60 ALR 259.
[2] 38 Am Jur, Negligence, § 295.
[3] 41 Am Jur, Physicians and Surgeons, § 125.
[4] 41 Am Jur, Physicians and Surgeons, §§ 128, 130.

Case by Erwin Thomas Facer against Dr. Sol. M. Lewis for injuries caused by alleged malpractice. Upon plaintiff's death, Mary Edith Facer, administratrix of his estate, was substituted as party plaintiff. Verdict for plaintiff. Judgment for defendant *non obstante veredicto*. Plaintiff appeals. Affirmed.

*Burke & Kreuger* and *Walter M. Nelson,* for plaintiff.

*Moll, Desenberg & Purdy,* for defendant.

SHARPE, J. This action was brought to recover damages for alleged malpractice by a physician in the use of the X-ray and from a judgment *non obstante veredicto* of no cause of action for defendant, plaintiff appeals.

On November 26, 1937, Erwin T. Facer consulted Dr. Sol. M. Lewis, defendant herein, because of warts on his feet. Mr. Facer had so many warts on his right foot that it was impossible to accurately count them. They seemed to radiate between the fourth and fifth toes on his right foot. On November 26, 1937, Dr. Lewis gave Mr. Facer a small dosage of X-ray over the entire foot and the same treatment was repeated on December 1, 1937, without the use of lead foil. On June 3, 1938, Mr. Facer returned for further treatment. On this date a small piece of lead foil with a hole in the center of the size of a wart was put over the wart to be treated and a larger piece of lead foil was placed over the small piece with a larger opening. The machine was set so that a current of five milliamperes would flow through the tube and the X-ray tube was set a distance of approximately 8 inches from the wart to be treated. An alarm clock was set to go off after 3 minutes 10 seconds. When the alarm rings the machine is

stopped as far as that one treatment is concerned. On the 9th of July other warts were treated in a similar manner. On July 16th, some of the same warts were treated as had been treated on July 9th. A treatment of one wart consisted of 3 different exposures until a total of 1,800 R units were given. On July 30th, some warts were treated and some that had been previously treated were also exposed to the X-ray. On August 6th, different warts were treated. On August 20th, treatment on four warts was completed and treatment started on new ones, while some were given their second treatment.

On September 10, 1938, the last treatment was given in the presence of Donald Facer, a son of Erwin T. Facer. He testified that the flesh around the warts looked healthy, but his father complained about it being sore. As to this treatment, Donald Facer described it as follows:

"My father was on that (operating table). He was laying [lying?] down. As near as I can remember the two sections near the head and the body was flat and the one section with the foot was at an angle down. Tipped down, not at right angles, just tilted maybe 10 degrees from a horizontal position. My father was lying flat with his legs on that tilted portion. He was dressed, just had to take off his shoes and socks on the right foot.   *   *   *

"Dr. Lewis brought the machine up to the table and he placed his foot—laid it right on the table, the inclined part, then he covered all except the spot he wanted to expose, the wart, with a sheet of, I would say lead or zinc. A piece of metal as it appeared to me, with a hole in it the size of the wart he wanted to treat and then he would bring the machine down to within about 6 inches of this spot and then whatever that would be, turn it on or—. No clear noise, it might have hummed, that would be about all.   *   *   *   Then he would place it where he wanted and turn it on and then he had an alarm

clock he would set for 2 minutes, as Dr. Lewis said. They were supposed to be 2-minute exposures. When I was in there, he set the exposures at 2 minutes. He brought a part of the machine over and placed it near by father's foot. From the nearest point of that machine to my father's foot, it was approximately 6 inches.

"I did observe the sizes of the openings in the lead or metal.   *   *   *

"The machine was brought down to 6 inches from the lead sheets, an alarm clock was wound and placed there. Dr. Lewis had everything arranged and set the clock, he did whatever other things he had to do, he would go away over in the other corner where they have a room where they mix things, I suppose a laboratory. He went from where my father was into a laboratory and when the alarm would go off, he would come back and shut it off. He removed the rays from my father's foot.

"The day I was there he gave him 11 such treatments. He would tell him to turn over so he would get different angles on the foot. These warts were in different places. He would tell him to turn over on his stomach and he would get underneath the foot and do the same thing, apply this piece of metal and then give him another exposure. The day I was there he did that 11 times. I couldn't say they were all 2 minutes, but he gave him 11 exposures and some of them were 2. How many were 2 I didn't count but there were some that were 2.   *   *   *

"Each time some metal covering was applied to the foot exposing the particular wart that was under treatment at that time.

"*Q.* Mr. Facer, what I want to find out is whether those holes in exhibits 1, 2, 3 and 4 are exactly the size of the wart, as you observed it there?

"*A.* No, they weren't the size of the wart. He would just want to take a certain area.

"*Q.* Now, for instance, when exhibit 3 was applied   *   *   *   were the warts to which exhibit 3 was

applied, as you saw it there, were they that size or was the wart smaller than the hole in exhibit 3?

"*A*. The wart was smaller.

"*Q*. And how much smaller?

"*A*. Well, I couldn't definitely tell you. All I know is that it would cover an area of not just one wart but he would take a group and he would put this over and then expose it so it wasn't over just one wart of that size, it was over several warts. Now, the size of the warts, I don't know. *  *  *

"I did hear talk about stepping up this treatment. I heard that conversation when I was in the room with Dad and Dr. Lewis. This conversation took place when he first laid on the table, he observed the foot, that is before he applied the machine, and the 3 of us were in the room. Dr. Lewis said he had given treatments previously and he said that they didn't seem to have taken effect, that the warts were still there and that he had better step it up. *  *  *

"*Q*. And whether at any time during that treatment you saw Dr. Lewis or anybody in his behalf as a nurse in his office or anybody, make any measurement from the opening of the light to your father's foot, any measurement of that distance?

"*A*. No, they didn't, with any instrument."

On May 17, 1939, Erwin T. Facer filed an amended declaration in which it is alleged that:

"Defendant was generally incompetent, negligent and unskillful in failing to make a sensitive test of the plaintiff's skin on his foot prior to the application of X-ray, that the defendant was further negligent in causing said X-ray to be focused on plaintiff's foot at a distance too near said foot; that the defendant was further negligent in using too large a quantity of current, in using too large a spark gap, and exposing the foot for too great a time, and having the foot too close to the target of the X-ray tube, and the defendant was further negligent in failing to use a meter to measure the current, and failing to measure the length of spark gap, and in failing to

keep track of the time, and failing to measure the distance of the target of the tube from the skin of the plaintiff's foot. The defendant was further negligent in giving the plaintiff too many X-ray treatments at short intervals during the period of time from on or about May 1, 1938, to on or about September 10, 1938; that the defendant was especially negligent on or about September 10, 1938, in giving X-ray treatment to the spot aforesaid which had been treated on or about May 1, 1938, in that the skin at the point aforesaid was tender, pink, sore, baked and had been scraped by the defendant about 1 month before until the warts bled; and that the defendant was further negligent in failing to provide lead foil as a protection to the plaintiff's foot during the removal of warts by X-ray; and defendant was further negligent in failing to provide lead foil of sufficient thickness as a protection to the plaintiff's foot in the removal of warts by X-ray and that the defendant was further negligent in using two strips of material containing holes in the same which were fitted over the warts to be removed in that said holes or openings were too large causing the surrounding tissue as well as the warts to be burned."

It is further alleged that as a result of the X-ray burns the skin on plaintiff's right foot broke down and became a discharging ulcer; that on January 26, 1939, it became necessary to have a skin graft; that subsequently 3 more skin-graft operations were performed; and that plaintiff had been rendered a cripple and suffered great pain.

On June 9, 1939, defendant filed an answer to the amended declaration admitting that he treated plaintiff for removal of warts. He denied each of the specific acts of negligence alleged in plaintiff's declaration and alleged that the treatment given to plaintiff was in accordance with the usual and ordinary practice of physicians and surgeons in Fern-

dale and like communities. He further alleged that if plaintiff did receive a burn on his foot it was in no way due to the negligence or failure to properly treat on the part of defendant.

On March 13, 1940, after the action was at issue, another skin graft was performed on Mr. Facer's foot at which time cancer in the sweat glands in one of the ulcerated areas was found. Mr. Facer's leg was amputated on March 21st and he died on April 13, 1940. The administratrix of his estate was substituted as party plaintiff and the case was tried before a jury.

When the cause came on for trial, defendant was called as plaintiff's witness. His testimony regarding the June 3d treatment was as follows:

"The first treatment consisted of placing a small piece of lead foil, with a hole in the center of it just the size of the wart or slightly larger but almost the same size as the wart, over the wart and this square foil covered an area of about 4 inches square and just the wart exposed and then this sheet, this small sheet of lead foil was covered over with a larger sheet of lead foil and the object, of course, of the larger sheet is to protect the skin beyond the small sheet from any stray rays that may come from the X-ray and then the X-ray machine was adjusted to give out a voltage of 45,000 volts which is a low voltage and the one I always have used for wart treatment and then another adjustment on the machine was set so that a current of five milliamperes, would flow through the tube and the X-ray tube was set a distance of 8 inches from the wart and I have a little ruler in my pocket I have carried for years for that purpose. I stick it under there quickly and get this 8-inch distance and then I have a clock, an interval timer, made especially for this purpose and it can be set to the second. This clock was set to 3 minutes and 10 seconds. Then after everything is in order as I have just described on

the machine, there is a long handle with a little button on the end of the cord, an electric cord with a handle on it on which there is a button and if you press this button and keep it pressed, that actuates the machine, while I am pressing the button it is giving off X-rays and the second I let go of it, it stops and there will be no X-ray coming. After everything is all ready, I start the clock that is already set for 3 minutes and 10 seconds and at the same time press this button and I have to hold it with my finger until the clock goes off, until the alarm rings, which it does very accurately at the end of the set time and when the alarm rings, I take my finger off the button and that stops the X-ray. On his first visit I treated 5 warts, according to my records. I did the same thing again, probably used a different piece of lead, a small piece if the wart was a different size and put the large sheet over the small one and went through the same procedure again and did that same thing 5 times on the 3d of June. That is what I did on the 3d of June."

He further testified:

"*Q*. Doctor, am I right in this, from what you said just now, that if you wanted to do the job in a hurry, you could give a stronger current and one exposure and do the work of 2 or 3?

"*A*. Yes, that is a well-recognized method of treatment too. In my method I used on Mr. Facer, I gave 600 R at each of 3 treatments or a treatment of 1,800 R, but many roentgenologists give 1,800 or 2,000 R all at once and some give 1,000 R in 2 treatments. It is just a matter of choice, more or less.

"*Q*. You heard Dr. Poole say that at the University of Michigan they use 6,000?

"*A*. In cases like that where they want to be sure, where they are pressed for time and they can't see it past 3 or 4 times and want to be sure to get it all at once, 6,000 units is sometimes given all at once on certain types of lesions.

"*Q.* Did you give as much as this?
"*A.* I gave a total of 1,800."

The only expert testimony offered by plaintiff, with the exception of defendant who was called as an adverse witness, was that of Dr. Poole of the city of Pontiac, an expert in X-ray therapy. He testified that X-ray is the best method for removing warts off the feet; and that it is necessary to give a destructive dosage to the warty growth. He testified in detail as to the many variable factors involved in this method of treatment, the object being to apply a given, known amount of radiation at the particular treatment; that the number of roentgen units a machine will deliver in a certain voltage at a certain time is uniform for that particular machine and the particular tube; that the time of exposure depends upon the distance of the ray to the wart, the filtration, and the machine; that if the filter is tightly applied the result of angulation of the ray from the right angle would be loss of efficiency; that the effect of angulation of the ray into normal tissue would vary according to the voltage; and that frequency of treatment depends upon the original dosage and other variable factors.

At the close of the entire case, defendant made a motion for a directed verdict for the reason that plaintiff had failed to present any competent evidence to sustain her allegations that defendant was guilty of any negligence that was the proximate cause of damages to plaintiff. This motion was taken under advisement and the cause was submitted to a jury who returned a verdict of $9,000 for plaintiff. The defendant then moved for a judgment *non obstante veredicto* upon the following grounds, among others:

"Because there was no competent testimony of any nature submitted by the plaintiff to show that

what this defendant did or failed to do was not in accordance with the usual and ordinary practice of physicians and surgeons in Ferndale and like communities."

The trial court granted defendant's motion and entered judgment for defendant *non obstante veredicto.*

Plaintiff appeals and claims that deceased's injury and death were caused by X-ray burns; that the X-ray burns were caused by (1) overexposure in point of time, (2) overexposure in point of frequency, and (3) overexposure by angulation of the rays from a right angle; that such acts or omissions were those of a "heedless person or a tyro;" that express testimony of malpractice is not necessary; and that from the circumstantial evidence in this case a question of fact arose as to defendant's negligent use of the X-ray.

Defendant urges that his conduct or acts in treating Erwin T. Facer can only be measured by medical or expert testimony; that plaintiff has the burden of showing by expert witnesses that what defendant did was contrary to the usual and ordinary practice of physicians in similar communities or that he omitted to do something that was ordinarily done; and that plaintiff failed to produce such evidence.

Plaintiff relies upon *Ballance* v. *Dunnington,* 241 Mich 383 (57 ALR 262), and *Winchester* v. *Chabut,* 321 Mich 114.

In *Ballance* v. *Dunnington, supra,* plaintiff brought an action against a physician for alleged malpractice in the use of the X-ray. He claimed that his foot was exposed to X-ray for $2\frac{1}{2}$ hours, that defendant so burned his foot that it became necessary to amputate it. At the close of plaintiff's proofs and at the close of all proofs, defendant moved for a directed verdict. We held that plain-

tiff's testimony relative to the period he was exposed to the X-ray stated an exposure for a period that even the merest tyro would know was improper *and every witness, including defendant,* said such dosage would have been improper; and that the evidence presented an issue of fact for the jury. We there said (pp 386, 387):

"The standard of care, skill, and diligence required of an X-ray operator is not fixed by the *ipse dixit* of an expert, but by the care, skill, and diligence ordinarily possessed and exercised by others in the same line of practice and work in similar localities.
\* \* \*

"Plaintiff's case rested upon the charge of negligence on the part of defendant in administering an excessive dosage and depends in the main upon his own testimony. The doctrine *res ipsa loquitur* is not recognized in this State, and, therefore, proof of the burn was no proof of defendant's negligence. Plaintiff had the burden of showing that he suffered an X-ray burn occasioned by an overdosage or exposure of his foot, and that such happened because defendant failed to exercise the reasonable and ordinary care, skill, and diligence possessed by others in the same line of practice and work in similar localities."

Under the circumstances of that case an exposure of $2\frac{1}{2}$ hours for the purpose of locating a needle which had broken off in plaintiff's foot, and not for the purpose of treatment, presented an issue of fact as to whether defendant failed to exercise that care, skill and diligence possessed by others in the same line of practice and work in similar localities. The holding in that case has no application to the facts in the case at bar.

In *Winchester* v. *Chabut, supra,* the alleged act of negligence was leaving a sponge in a wound causing abscesses and in defendant's failure to perform

an exploratory operation when the abscess formed. There was no direct testimony or evidence that a sponge had been left in the wound. Defendant contended that the court should have directed a verdict because there was neither direct nor medical nor scientific evidence establishing or tending to establish the leaving of a sponge in the wound and no evidence of malpractice. We there said (p 119):

"Lack of direct evidence of the alleged act of negligence is not fatal to plaintiff's case when there is evidence from which an inference to that effect may legitimately be drawn. *LeFaive* v. *Asselin,* 262 Mich 443."

However, there was testimony of one of defendant's expert witnesses that a surgical sponge might conceivably be erupted through one or more abscesses, thus laying a foundation from which a jury might legitimately draw the inference that a sponge had been left in the wound at the time of the operation. We there said: "That this did not constitute good medical practice need not have been (*LeFaive* v. *Asselin, supra*), but was, shown by the testimony of expert witnesses."

Although we have held that leaving a sponge in a wound is not good medical practice and does not require the testimony of expert witnesses to establish this fact, the proper or improper use of X-rays does require the testimony of experts. In the *Chabut Case* expert testimony was not required and it is not authority for the claim made by plaintiff in the case at bar.

Plaintiff also urges that the testimony of Donald Facer established the basis for which the jurors could find or infer a negligent burning by X-rays. The testimony of Donald Facer is that of a layman. He makes no pretense of knowing the standard of care, skill, and diligence required of an X-ray oper-

ator possessed and exercised by others in similar communities.

Although laymen generally are acquainted with the fact that X-rays are destructive and may result in burns or other serious conditions, yet the testimony of plaintiff's own medical witness was such as to clearly demonstrate that an X-ray treatment for warts involves questions of skill, judgment and practice beyond the knowledge of laymen and upon which a jury would need the advice of experts to determine whether or not the claimed acts of defendant were improper. We believe the facts in the case at bar are such that the questions of negligence became exclusively for expert testimony. The doctrine of *res ipsa loquitur* is not recognized in this State. The evidence surrounding the claimed burn, its cause and effect were not sufficient to require defendant to respond in damages and should not have been submitted to the jury. The trial court was correct in directing a judgment for defendant *non obstante veredicto* which judgment is affirmed, with costs to defendant.

BOYLES, C. J., and REID, NORTH, DETHMERS, BUTZEL, CARR, and BUSHNELL, JJ., concurred.