Ragan *v.* Steen, et al., Appellants.

516

Argued November 15, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, CERCONE, and SPAETH, JJ. (SPAULDING, J., absent.)

518

*Bruce R. Martin,* for appellant at No. 413; *Allen T. Lane,* with him *Wayman, Irvin, Trushel & McAuley,* for appellant at No. 414.

*Allan H. Cohen,* with him *Gatz, Cohen, Segal & Koerner,* for appellee at Nos. 413 and 414.

*Allen T. Lane,* with him *Wayman, Irvin, Trushel & McAuley,* for appellee at No. 413.

OPINION BY JACOBS, J., September 23, 1974:

Plaintiff-appellee, James Ragan, obtained a jury verdict against defendants-appellants Oliver Steen and McKeesport Hospital in a medical malpractice action. The lower court molded the verdict and entered judgment for indemnity over against Oliver Steen in favor of McKeesport Hospital. From this judgment both defendants appeal raising questions as to the limitation of actions, the sufficiency of the expert testimony to establish evidence of negligence, and the ability of the lower court to mold the verdict giving the hospital the right to indemnity. We find that the plaintiff-appellee's evidence was timely produced establishing a right to recovery and that the defendant hospital is entitled to indemnity. Therefore we affirm.

In September 1968, appellee consulted his family physician concerning a colony of plantar warts on his right foot. His doctor referred him to McKeesport

Hospital to determine if x-ray treatment was advisable for removal of the warts. At the hospital he was seen by Dr. Steen, who was employed by the hospital as a radiologist. After two radiation treatments administered by Dr. Steen, appellee returned to his studies at Ohio University. A blister developed on the site which he had treated at the University Health Center and thereafter the area appeared to heal normally. However, in November 1970 the tissue in the area where the warts had been began to decompose and the appellee began to experience pain in his foot. He visited doctors in an attempt to remedy the increasing decomposition and finally in May, 1971 surgery was performed. However, despite all efforts appellee remains with a permanent disability.

On March 30, 1971 appellee filed a complaint in trespass against both Dr. Steen and the McKeesport Hospital. The complaint asserted the negligence of Dr. Steen in Count I. In Count II, liability on the part of the hospital was asserted based on its own negligence and on its vicarious liability as the employer of Dr. Steen. The jury returned a verdict in favor of the appellee, finding "Oliver Steen and McKeesport Hospital equally responsible." The court en banc molded the verdict on the hospital's motion, granting the hospital indemnity over against Dr. Steen, but denied the appellants' motions for judgment n.o.v. and for a new trial. Judgment was therefore entered in favor of the appellee, against both appellants for $40,000 with indemnity over to McKeesport Hospital against Dr. Steen.

The first question raised by the appellants is whether the two year statute of limitations[1] should bar the appellee's personal injury action. The two year period

---

[1] The limitation of personal injury actions is covered by the Act of June 24, 1895, P. L. 236, §2, 12 P.S. §34.

on actions such as this begins to run when the injury is done. It is undisputed in Pennsylvania that the injury is considered done "when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Ayers v. Morgan,* 397 Pa. 282, 290, 154 A.2d 788, 792 (1959). Appellants contend that this point was reached when the blister on the affected area appeared in October 1968 warning the appellee of his damaged condition and that an act of negligence had been committed. Appellee maintains that since the blister healed, the warts were gone and the foot appeared normal, he had no reason to know of the injurious effects of the x-ray until November 1970 when the area began to decompose. Which of these two positions is substantiated by the evidence is a question which the jury must decide. *Schaffer v. Larzelere,* 410 Pa. 402, 189 A.2d 267 (1963) ; *Ayers v. Morgan,* supra. The lower court correctly submitted this issue to the jury, and the jury determined that the action had been timely commenced. There was ample evidence in support of this finding.

In support of their motion for judgment notwithstanding the verdict, appellants maintain that the expert testimony produced in support of the plaintiff-appellee's claim did not establish negligence on the part of Dr. Steen. At trial, the appellee called two expert witnesses. The first, a pathologist, testified that from an examination of tissue removed from appellee's foot he concluded that the ulceration had been produced by radiation. The second, Dr. Herring, testified that after examining the appellee and studying his history it was his opinion that the only cause for his injury was an overdose of radiation. He based this conclusion on his knowledge of the effects of x-ray treatments when radiation is used in massive doses and on his experience that tissue death and ulceration can follow such therapy.

If the testimony elicited at trial is to establish proof of medical malpractice, it is necessary that it meet certain well recognized standards. The physician is not expected to guarantee a good result from the course of treatment he recommends or administers. To obtain a recovery against a doctor when the prescribed treatment results badly, the plaintiff initially must prove either that the physician did not possess or employ the skill and knowledge required to effect a cure, or that he did not exercise the care and judgment of a reasonable man under like circumstances. In addition, it must be shown to the satisfaction of the trier of fact that the specific injury complained of resulted from such failure of skill and knowledge or lack of reasonable care. A course of treatment which culminates in a bad result is not evidence of negligence in a malpractice case. There can be no inference of negligence due to a bad result which might have occurred despite the use of reasonable care. *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968). Where the treatment of a patient's condition is such that the attendant risks and the consequent injury are not matters within the experience of layman, expert testimony is required to establish a right of action. *Collins v. Hand*, supra; *Taylor v. Spencer Hospital*, 222 Pa. Superior Ct. 17, 292 A.2d 449 (1972).

In the present case, appellants contend that Dr. Herring was not qualified to testify as an expert on the cause of the appellee's injuries and that therefore his testimony should not have been considered by the jury. Because the witness was a surgeon and not a radiologist, and was admittedly unfamiliar with the practice of removing plantar warts by x-ray, it is argued that his testimony merely goes to show a bad result from a course of treatment and is no proof of negligence. Dr. Herring, however, had had occasion to refer many of his own patients for x-ray treatment,

was knowledgeable of the risks of this treatment, and had had occasion to observe the results to the patient when massive doses of radiation were administered. If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he or she is qualified as an expert. Whether the witness's knowledge or experience justifies admitting his testimony for the consideration of the jury is a matter within the discretion of the trial judge, and the weight to be given this evidence is for the jury. *Moodie v. Westinghouse Electric Corp.*, 367 Pa. 493, 80 A.2d 734 (1951); *Taylor v. Spencer Hospital*, supra. Due to the witness's familiarity with the use of x-ray and his knowledge of the results of radiation given in massive doses, we find no abuse of discretion on the part of the trial judge in admitting his testimony.

We also find no merit in the appellants' contention that Dr. Herring's testimony showed only his recognition of a bad result unconnected with any lack of skill or reasonable care on the part of Dr. Steen. Dr. Herring indicated that in his expert opinion the depth of tissue death in the appellee's foot could have occurred only through an overdose of radiation when he was being treated for removal of his plantar warts. That is, the dose of radiation that caused the decomposition of his foot was significantly greater than necessary under the circumstances. This testimony was supported by that of Dr. Totten, the pathologist. It is not denied that Dr. Steen prescribed and supervised the administration of radiation. Under these facts a properly instructed jury would not be inferring negligence from the existence of an injury alone, but would have an adequate factual basis on which to infer a lack of skill or reasonable care in the treatment of the appellee.[2]

---

[2] *See Stemons v. Turner*, 274 Pa. 228, 117 A. 922 (1922) where the lower court instructed the jury that they could conclude the

The appellants further contend that the chance of a malfunctioning of the x-ray machine itself was not eliminated. However, there was no testimony in the record that the machine used was in any way defective. Since the possibility of a defective machine was not fairly suggested by the evidence, there was no need for the appellee to disprove this possibility as a cause of the injury. "[I]t is not the rule that circumstantial evidence to establish negligence need exclude everything which the ingenuity of counsel may suggest as having possibly caused or contributed to the injuries or death." *Straight v. B. F. Goodrich Co.*, 354 Pa. 391, 396, 47 A.2d 605, 607-608 (1946).

Finally it is contended that the question of the hospital's right to indemnity from Dr. Steen was improperly considered by the court below.[3] No claim for indemnity was made in the pleadings but at the conclusion of the trial, McKeesport Hospital requested the following point for charge: "If you determine that the plaintiff's injury was caused by the negligence of the defendant, Oliver Steen, then you must find that the defendant, Oliver Steen, is liable over to the defendant, McKeesport Hospital, to indemnify the hos-

---

defendant acted negligently if they determined the plaintiff merely sustained an x-ray burn on his groin. In so doing, the court directed the jury to hold the defendant to a higher standard of care by permitting a finding of negligence on the basis of proof of an x-ray burn alone without consideration of the defendant's skill or care in administering the treatment. The case was remanded for a new trial by the Supreme Court with the instruction that the res ipsa loquitur doctrine was not to be applied to x-ray burning cases.

[3] Appellants raise substantially the same issues in their motion for a new trial, arguing that it was error for the trial judge to instruct the jury solely on the basis of Dr. Steen's negligence. However, we agree with the trial judge that the evidence was sufficient to create a jury question as to the negligence of Dr. Steen and that there was no evidence suggesting negligence on the part of the hospital.

pital for the amount of any verdict rendered." In granting the point for charge, over the objection of Dr. Steen, the trial judge instructed the jury on the law of indemnity stating that if Dr. Steen was found negligent the verdict would have to be returned against both defendants since the hospital remained liable for the acts of its employee. The court continued, however, to charge that "from all of the evidence, there is no negligence on the part of the McKeesport Hospital and the only negligence is that of Dr. Steen" and that in such a case Dr. Steen would be found to be liable over to his employer the hospital, for the amount of any verdict entered. The verdict as returned by the jury found that both defendants Oliver Steen and McKeesport Hospital were "equally responsible" but failed to state Dr. Steen's liability over to the McKeesport Hospital as instructed. Upon the motion of the hospital the court molded the verdict to conform to the charge, adding the finding of indemnity.

It is now contended by Dr. Steen that since both appellants were original defendants to the plaintiff's suit, the proper way to raise the issue of indemnity between the co-defendants was for the hospital to plead it in its answer under new matter as provided by Pennsylvania Rule of Civil Procedure 2252 (d). Rule 2252 generally concerns the joinder of additional defendants and section (d) of that rule permits the joinder of any party, whether plaintiff or defendant, as an additional defendant by the assertion under new matter "that such party is alone liable to the plaintiff or liable over to the joining party . . . ." The question we must consider is whether the failure of the hospital to join Dr. Steen, an original defendant, as an additional defendant for the purpose of determining indemnity, results in the loss of appellant hospital's right to have that issue resolved in this suit.

As originally enacted, Rule 2252 permitted the joinder as an additional defendant of any person who was not already party to the action who might be solely liable or liable over to the original defendant or jointly or severally liable with him. In 1961, the rule was amended to allow the joinder as an additional defendant of a co-plaintiff in the cause of action. The rule was amended again in 1969 to provide a procedure for joining any party, plaintiff or defendant, who might be solely liable, liable over or jointly or severally liable with the joining party. The purpose of these amendments was to provide a short cut procedure for disposing of matters involving numerous parties with divergent interests, avoiding the cumbersome three step process of severance, joinder and consolidation formerly required if one wished to join a person already party to the action. *Goughenour v. Campbell*, 219 Pa. Superior Ct. 142, 281 A.2d 69 (1971); Goodrich-Amram, Procedural Rules Service, §2252 at 235 et seq., (Supp. 3 & 4, 1974).

In construing this rule as it applies to the circumstances of this case, a number of principles are to be kept in mind. Generally applicable to all the rules of civil procedure is Rule 126 which provides that "[t]he rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable." Such an approach is particularly pertinent where multiple parties are involved since in such cases the primary intent of the rules is to avoid multiplicity of suits by providing for the adjudication of all the rights and liabilities of those present and concerned in a single suit. *Martinelli v. Mulloy*, 223 Pa. Superior Ct. 130, 299 A.2d 19 (1972). This Court has favored the policy of broadly interpreting Rule 2252 "not only to compel every interested person to defend the action by the plaintiff, but also to save the original defendant from possible

harm resulting from loss of evidence as might result if compelled to await the end of the suit before proceeding against those from whom he seeks contribution." *Martinelli v. Malloy,* supra, at 135, 299 A.2d at 21.

In the present case, appellant, McKeesport Hospital, could have utilized Rule 2252 (d) to raise clearly the issue of indemnity between the two original defendants, appellants here, by asserting its right to liability over in its answer as new matter. This process would insure the determination of the respective parties' primary or secondary liability to the plaintiff at trial. However, in this case the plaintiff appellee asserted in his complaint not only the liability of Dr. Steen and the McKeesport Hospital through their separate negligent acts, but also liability of the hospital on the basis of its relationship as an employer to Dr. Steen. The employment relationship was admitted by both appellants. Since no evidence was introduced by any party to establish grounds upon which the hospital could be held liable due to its own acts or omissions, the only basis on which it could be held liable was by virtue of the vicarious liability of an employer for the negligence of its employee acting within the scope of his employment. Where an employer is not negligent by his own act, it is well recognized that his liability to the injured party is only secondary to that of the negligent employee. The employer therefore is entitled to indemnity for any payment of damages he is compelled to make from the employee who is primarily liable. *Burbage v. Boiler Engineering & Supply Co., Inc.,* 433 Pa. 319, 249 A.2d 563 (1969) ; *Builders Supply Co. v. McCabe,* 366 Pa. 322, 77 A.2d 368 (1951) ; *Mixter v. Mack Trucks, Inc.,* 224 Pa. Superior Ct. 313, 308 A.2d 139 (1973).

Prior to the amendment of Rule 2252 (d), where suit was brought against both an employer and em-

ployee, and liability was established against the employer only through the application of the respondeat superior doctrine, this Court did not question the employer's right to indemnity. Although procedure was not available at that time for joining a person already a defendant on another issue, it was recognized that the defendant primarily liable was a party to the suit and had had opportunity to participate in the defense. Consequently the liability of the defendants between themselves could be established in the plaintiff's action, without separate suit. *Muldowney v. Middleman,* 176 Pa. Superior Ct. 75, 107 A.2d 173 (1954). The right of the parties to a determination in a single action of all their obligations to one another regarding the subject matter of the suit was also recognized in *East Broad Top Transit Co. v. Flood,* 326 Pa. 353, 192 A. 401 (1937). In that case it was stated that in the absence of a jury finding as to the right to recovery over, the proper approach of the party claiming secondary liability was to object to the receipt of the verdict or to move that the court mold the verdict to conform with the jury's intent.

Considering that the amendment of Rule 2252 (d) was intended to promote the resolution of all parties' rights in a single suit it is indeed anomalous in a case such as this to advance the method provided by the rule as a reason for denying the parties a right previously held, forcing them to maintain a separate suit. The evidence here showed that the only liability of the hospital was the vicarious liability of the employer. Failure of the hospital to assert against its co-defendant the employment relationship which would entitle it to indemnity should not operate to force the parties into the futile exercise of a separate suit when the plaintiff's complaint to which both defendants were responding in court asserted that very relationship. Such a result would unnecessarily exalt the form of the

procedural rules over their substantive objectives. *Goughenour v. Campbell,* supra. In this case we believe that the judge acted correctly in charging the jury on the issue of indemnity and subsequently molding the verdict to clarify the jury's unexpressed intention. See, *Gombar v. Schaeffer,* 202 Pa. Superior Ct. 282, 195 A.2d 527 (1963); *East Broad Top Transit Co. v. Flood,* supra.

Judgment affirmed.

WRIGHT, P. J., took no part in the decision of this case.

SPAULDING, J., took no part in the consideration or decision of this case.

———

CONCURRING OPINION BY SPAETH, J.:

I do not find it helpful to ask whether a witness has "any reasonable pretension to specialized knowledge." A "pretension" is "[a]n assertion or declaration whose truth is questioned or falsity suspected; an allegation of doubtful value; a pretext." Webster's New International Dictionary 1959 (2d ed. 1938).

When a witness is offered as an expert the first question should be whether the subject is "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." McCormick on Evidence 29 (2d ed. 1972) (footnote omitted). If the subject is of this sort, the next question should be whether the witness has "sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *Id.* at 30 (footnote omitted). *See also* Rule 702 of the Proposed Rules of Evidence for United States Courts and Magistrates (1972), and the Advisory Committee's Note to the rule; Wigmore on Evidence §555, §1918 (3d ed. 1940). In answering these questions much must be left to the common sense of the trial judge.

Perhaps Judge HOFFMAN is right that in malpractice cases there is a tendency to permit witnesses "to testify as experts simply by virtue of their licenses or degrees." I do not however think that is what happened here. Instead I agree with Judge JACOB's summary of Dr. Herring's testimony; and at least in my judgment the testimony appears to have been properly admitted.

---

DISSENTING OPINION BY HOFFMAN, J.:

This case presents an opportunity to reconsider when an expert witness may give opinion evidence.

In September of 1968, at the direction of the appellant, Dr. Oliver Steen, and administered at the McKeesport Hospital, an appellant herein, the appellee, James Ragan, age 23, received two doses of radiation therapy for the removal of plantar warts from the sole of his right foot. Following the treatment, the foot appeared to be in a normal condition until November of 1970, when Ragan noticed a large crack developing at the same spot on his foot, and began experiencing pain in the region. The appellee consulted a Dr. Beck, who referred him to a Dr. Conklin, who thereupon cleaned the area and cut away some flesh. The tissue in the area, however, continued to decompose to such an extent that a large ulcerated hole surrounded by necrotic tissue existed at the site. In May of 1971, surgery and skin grafting were performed at Presbyterian-University Hospital in Pittsburgh, and the appellee was left with a permanent disability.

On March 30, 1971, suit was instituted against Dr. Steen and McKeesport Hospital. The appellee, plaintiff below, called two expert witnesses. The first was Dr. Robert Totten, chief pathologist at Presbyterian-University Hospital, who testified that he examined a specimen of ulcerated tissue taken from plaintiff's foot

during the surgery in May of 1971. It was his opinion that the ulceration had been caused by radiation burns.

The dispute arises from the testimony of the second expert witness, Dr. Norton Herring, in active practice as a surgeon since 1960.[1] Dr. Herring testified that, in his practice, he had surgically excised many plantar warts. He stated that he was familiar with radiation therapy as he had referred many of his patients for massive doses of x-ray therapy in the treatment of cancer. Dr. Herring said that after examining the plaintiff's foot on March 29, 1971, it was his opinion, on the basis of the results he observed, that the ulcerated condition had been caused by an overdose of radiation, which dosage he characterized as "excessive" and "massive." When asked on direct examination, whether he was "familiar with the practice of x-ray therapy for plantar warts . . . .", he replied: "No, sir, I'm not familiar. I have never, in my entire practice, referred a patient with plantar warts for x-ray therapy for plantar warts." When Dr. Herring opined that "the only thing that could have produced this was an overdose of radiation therapy for the treatment of warts . . . .", defense counsel moved to strike the testimony "because there is no testimony in the history as to what dosage was given, there is no testimony as to what the standard dosage is; and the testimony of overdosage has no basis whatsoever." The Court refused to strike the answer.

---

[1] It is also alleged that the trial court erred in failing to dismiss the case for reason that the action had been barred by the statute of limitations. Since it is undisputed that the plaintiff's foot appeared normal until November of 1970, the fact that radiation therapy occurred in 1968 is of no consequence. It is well-established that the statute of limitations does not begin to run until discovery of the injury is reasonably possible. *Schaffer v. Larzelere*, 410 Pa. 402, 189 A.2d 267 (1963) ; *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959).

Dr. Herring admitted that radiation therapy was an accepted course of treatment for plantar warts in 1968. He further said that he did not read the hospital records, nor read any written work in the field (though he said that he would not be surprised if there was a large body of literature on the subject), nor could he say what dosage was given the plaintiff, nor know "the accepted medical practice as to dosage of radiation for the x-ray therapy of plantar warts" but this "you would have to get . . . from the radiotherapist . . . ." His total lack of knowledge as to the standard according to the "accepted medical practice" is evidenced by the following line of questioning: "Q. The reason you couldn't [say what is the accepted practice] is because you're ignorant or do not have knowledge of what is the standard dosage. Is that right? A. That is right, sir. Q. But you do know, from your general knowledge, that these standard dosages and standard procedures sometimes produce an undesired effect. Isn't that right?[2] A. I do not have that knowledge in the treat-

---

[2] Our research had disclosed that the incidence of radiation burns was common among patients treated with x-ray therapy, even when the dosage was well within the standard acceptable and practiced by the profession. Dr. Steen testified that he administered two equal doses of 1000r's, totalling 2000r's, which he stated was the standard dosage for a wart cluster (a mosaic of many warts closely spaced). In a recognized textbook entitled *"Radiotherapy of Benign Disease"* published in 1965, Dr. Stephen B. Dewing observes at 221:

"If a single dose is to be used, either 1,000 or 1,200r will suffice for most lesions not over a centimeter in diameter. Some prefer to use larger doses, going up to 1,800r for a single dose. . . . Others vary the dose in inverse proportion to the size of the lesion, as in the schedule of Pipkin et al. which varies from 1,000r for a wart of 12 mm. diameter, to 2,720 for a 2 or 3 mm. wart. . . . Alternatively, a wart may be treated fractionally with doses of 600r every two weeks for three treatments, or 900r weekly for three treatments. Thomsen and Rauschkolb recommend contact

ment of plantar warts. Q. You do have knowledge, generally, that the standard treatment, with an accepted treatment of various conditions in the field of medicine and surgery, sometimes produce undesired results. Isn't that correct? A. Yes, sir. That is true." On re-direct examination, he stated that the only basis of his opinion that plaintiff received an "overdosage" of radiation was: ". . . the extent and depth and degree of death of tissue, as represented by this ulcer, could only have been caused by an excessive dose of radiation, which excessive dose is defined as an overdose."

The jury, after receiving the trial court's instructions, awarded the plaintiff $40,000, finding "Oliver Steen and McKeesport Hospital equally responsible." Motions for a new trial and judgment n.o.v. were denied by a court en banc, but the Court granted the Hospital's motion for indemnity rights. In its Opinion, the lower court stated: ". . . that fact that the jury's verdict was against both defendants declaring them equally responsible is insignificant . . ." The Order of the Court

---

therapy with a single dose of 2,500 to 3,000r at 47.5 Kv (HVL 0.3 mm. Al), noting that smaller doses impair the cure rate when contact therapy is used."

It is well-recognized among radiotherapists that when a course of x-ray treatments is given for a specific purpose, a standard dose is generally administered at the outset of therapy, and while additional doses are contemplated over a period of time, many patients develop varying degrees of skin irritation so that a change in the schedule may become necessary. In the instant case, there is nothing in the record to indicate that the plaintiff developed a local reaction necessitating a change in the scheduled second dose.

As one widely-read source points out: "The effects of radiation on the skin vary greatly with the dose delivered, the quantity of radiation, the size of the radiated area, the regions of the body, and the individual idiosyncrasy." *Cancer—Diagnosis, Treatment and Prognosis*, by Lauren V. Ackerman & Juan deRegato, at page 101. The Doctors further concluded that 'late effects vary according to the protraction of the total dose and the individual idiosyncrasy."

molded the verdict making Steen liable over to the defendant hospital in the amount of $40,000.[3] Instant appeals followed.

In Pennsylvania, it is necessary that expert medical testimony be introduced to establish that a defendant has negligently carried out his professional duties and departed from the standard of care exercised by other physicians in the community. *Lambert v. Soltis,* 422 Pa. 304, 221 A.2d 173 (1966); *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558 (1935). "The only exception to the requirement that expert testimony be produced is 'where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons. . . .' " *Smith v. Yohe,* 412 Pa. 94, 99, 194 A.2d 167 (1963); *Lambert v. Soltis,* supra at 308-309.

The standard amount of dosage acceptable in the medical practice for the treatment of plantar warts through x-ray therapy is certainly not a fact known by the average layman, let alone the average physician. Dr. Herring, a surgeon for more than 10 years, himself admitted an ignorance on the standard dosage in such a case. It is evident that, in order for the plaintiff to satisfy his burden in the instant case, he had to produce competent expert opinion that the defendants departed from the recognized standard of care.

In trying a medical malpractice case, it is not, nor has it ever been enough to simply produce evidence of the "bad result." *Lambert v. Soltis,* supra; *Smith v. Yohe,* supra; for other jurisdictions, see, e.g., *Nance v. Hutch,* 233 N.E. 1, 76 S.E. 2d 461 (1953); *Bennett v. Los Angeles Tumor Institute,* 102 Cal. App. 2d 293, 227

---

[3] It was admitted by the defendants that when defendant Steen administered the x-ray therapy to plaintiff he was employed by defendant hospital and was acting within the scope of his authority and on behalf of the hospital.

534

P. 2d 473 (1951); *Facer v. Lewis,* 326 Mich. 702, 40 N.W. 2d 457 (1950).

In a case having a factual situation similar to the instant case, the Pennsylvania Supreme Court reversed a judgment in favor of the plaintiff, where there was expert testimony to the effect that plaintiff suffered radiation burns of the groin region. *Stemons v. Turner,* 274 Pa. 228, 117 A. 922 (1922). While the Court reversed primarily because the case was submitted to the jury "substantially on one ground," i.e., that from the existence of the burn negligence could be inferred, the Majority recognized that the case had ostensibly been submitted as a negligence case. The Court concluded at 232: ". . . there was no evidence to show that the defendant used a dangerous formula. While the judge charged that there could only be a recovery if the defendant was negligent, nowhere does he point out what the specific negligence was, but permitted it to be inferred from the injury alone." *Stemons,* supra at 232.

I believe that a judgment based entirely on the testimony of two expert witnesses—the first identifying the disability as stemming from a radiation burn; and the second corroborating the cause, but adding, without the slightest pretense of knowledge as to the standard dosage administered in the course of radiation therapy, that the burn was a result of an "overdosage"—may not stand. Nowhere was it shown that "the defendant negligently or ignorantly used the x-ray, on the occasion when he subjected plaintiff to it, measuring the skill and care required of him in its use as a 'duty to do so with the skill reasonably required in the proper use of such practice and treatment.' " *Stemons,* supra at 231, citing *McCandless v. McWha,* 22 Pa. 261 (1853).

To this date, we have recognized the oft-quoted rule that a witness is qualified as an expert if he or she "has any reasonable pretension to specialized knowledge on

the subject under investigation . . . and the weight to be given to his evidence is for the jury." *Moodie v. Westinghouse Electric Corp.*, 367 Pa. 493, 501, 80 A.2d 734 (1951); *Taylor v. Spencer Hospital*, 222 Pa. Superior Ct. 17, 22, 292 A.2d 449 (1972). In the case of medical experts, our courts have recognized the fact that different doctors have different qualifications, some being more qualified than others to testify about certain medical practices. Nevertheless, this Commonwealth has taken the position that all medical doctors are qualified to testify concerning medical subjects, and it is for the jury to determine the weight to be given to expert testimony, "in light of the qualifications shown by the expert witness."[4] *Taylor v. Spencer Hospital*, supra at 24, f.n. 2; *Moodie v. Westinghouse Electric Corp.*, supra; *Commonwealth v. Morris*, 205 Pa. Superior Ct. 105, 207 A.2d 921 (1965).

It is fundamental that it is within the discretion of the trial judge to rule on the admission of expert testimony on the basis of qualifications or competency. Where, however, the trial court commits clear error, that error will constitute reversible error on appeal. *Flavin v. Aldrich*, 213 Pa. Superior Ct. 420, 250 A.2d 185 (1968). I believe the trial court clearly abused its discretion in accepting the testimony of Dr. Herring, and in submitting the case to the jury on the evidence. There is nothing in the record to indicate that Dr. Herring ever established or had knowledge of a standard course of conduct in the treatment of plantar warts

---

[4] In *Taylor*, supra, we reversed the lower court's denial of a new trial because we considered the exclusion of testimony of a licensed practical nurse, because she was not a registered nurse, erroneous. We said at 26: "If a duly qualified practical nurse is permitted by law to do certain acts, and she has in fact done those acts or is familiar with them, there is no reason why she could not testify as an expert witness as to the proper method of performing those acts."

by radiation therapy. Absent familiarity with a course or method of treatment, I believe the law should be that a witness, irrespective of his standing as a qualified physician, may not qualify as an expert witness in a medical malpractice case involving the expression of an opinion on the care or skill of a specialist.

It is time that Pennsylvania join the states which have recognized the absurdity of permitting witnesses to testify as experts simply by virtue of their licenses or degrees. If we are to remove speculation from the role of the jury, we must take cognizance of the fact that the medical profession, as with many occupations, has progressed as swiftly as technology has seen the "horse-and-buggy" era give way to the age of the automobile. The new discoveries, the innovative procedures and practices, and even the birth of fields unknown to medical science just a few years ago (cancer immunologists, transplant specialists, fetologists, and specialists in nuclear medicine, to name a few), have flooded medical science with data no one man can possibly digest.[5] Physicians have gone so far as to set

---

[5] Before World War I, general surgery encompassed every form of surgery then in practice. By the 1920's, neurosurgery had branched off, establishing itself as a distinct specialty. Cardiac surgery and other subspecialties followed in rapid succession. Today, a urologist may understand all the techniques and pitfalls of surgery of the genito-urinary system, treating urinary disorders of both sexes, while confining his practice to the sexual disorders of only the male. A distinct specialty—gynecology—has developed to handle the sexual disorders of the female.. Similar examples of specialization and separation of unique skills and techniques may be found in every subdivision of general surgery. It may safely be said that there are in excess of 500 surgical techniques practiced today, over 100 in orthopedic surgery alone. A physician in practice for a number of years could conceivably be totally ignorant of literally hundreds of accepted techniques in the treatment of a given problem. Unless a physician were given special training or exposed to same, he would never undertake such techniques as cardiac catheteriza-

up a referral system taking a patient from a diagnostic specialist (-ologist) to a specialty surgeon (e.g., neurologist-neurosurgeon, cardiologist-cardiac surgeon). This system is so well implanted that a general practitioner would be exposing himself to potential malpractice by attempting to treat a condition properly referrable to a specialist. Physicians are themselves the first to admit the folly of treating a condition on the basis of their textbook or medical school experience, with the virtual certainty that a bad result would be easily linked to a failure to take cognizance of or utilize a course of treatment which had developed within a given specialty through clinical studies, medical treatises, and theoretical experience. We, as lawyer-judges, must take cognizance of the realities of a burgeoning and progressing world. It is neglect of the first order, and a death blow to the medical world, to ignore such facts.

A number of jurisdictions have reacted to the development of medical science by rejecting notions that a physician or surgeon is shown to be competent to testify as a medical expert by demonstration that he has been duly licensed to practice medicine or surgery. This enlightened view may be generally expressed as requiring that in order to qualify as an expert, a medical witness must have some familiarity with the particular medical or surgical technique involved in the suit, unless the technique itself is so unique, as where the defendant is its sole practitioner, that no witness familiar with it is available. These courts have held that *familiarity* may be demonstrated through means other than "occupational experience," but may be gained

---

tion, bronchoscopic examinations and other procedures that are everyday concerns of the specialist. Just as he would not attempt a procedure with which he lacked sufficient training and experience, so would it be absurd to permit the average physician or specialist in another field to testify on matters on which his knowledge and familiarity is lacking.

through private study, by observation, or by consultation with other physicians and surgeons.[6] See, *Hawkins v. Schofman,* 204 So. 2d 336 (Fla. 1967); *Steinberg v. Indemnity Ins. Co.,* 364 F. 2d 266 (5th Cir. 1966); *Swanson v. Chatterton,* 281 Minn. 129, 160 N. W. 2d 662 (1968); *Harris v. Smith,* 372 F.2d 806 (8th Cir. 1967); *Carbone v. Warburton,* 11 N.J. 418, 94 A.2d 680 (1953); *Hunt v. Bradshaw,* 251 F.2d 103 (4th Cir. 1958); *Huttner v. MacKay,* 48 Wash. 2d 378, 293 P. 2d 766 (1956); *White v. Moore,* 134 W. Va. 806, 62 S.E. 2d 122 (1950).

Illustrative of this view, and involving a fact situation similar to the instant case, a California appeals court held that a chiropodist could not testify in an action against a hospital and its radiologist for burns suffered through the use of radiation therapy for papillomae (warts on the skin or the mouth). *Bennett v. Los Angeles Tumor Institute,* supra. The court stated that although the witness, as a licensed physician, was permitted to use x-ray treatment in his practice and had taken basic medical courses, including the study of dermatology and skin conditions, in view of the fact that he had never administered such treatments and in the absence of any evidence of any private study of the subject through attendance at lectures, reading, or contact with other men in the field, the trial court's decision in excluding his testimony on this point was not an abuse of discretion on its part.

---

[6] A few other jurisdictions have gone even further, requiring that the expert demonstrate "occupational experience", or rather that the witness himself has performed or carried out the technique. See, e.g. *Pearce v. Linde,* 113 Cal. App. 2d 627, 248 P. 2d 506 (1952). A less restrictive view has been taken by some courts finding an expert witness qualified if he possesses the skill required to administer such treatment or perform the technique on which he testifies. See, e.g., *McCoy v. Buck,* 87 Ind. 433, 157 N.E. 456, reh. den. 160 N.E. 46 (1927) (radiation burn case against x-ray specialist).

In the instant case, Dr. Herring was unable to state with any degree of medical certainty that the defendants had deviated from the recognized standard of care for the treatment of plantar warts. He could not tell what was a proper dosage, but could only say that his examination of the burn (the result) indicated, in his opinion, the administration of an overdose of x-rays. When questioned on his familiarity with techniques, equipment, or methods, he said that he had made no studies, but that there was undoubtedly a great body of literature on the subject. I believe that it was a clear abuse of discretion for the trial court to admit Dr. Herring's testimony for the jury's consideration. I believe we should take the view already adopted by an increasing number of jurisdictions that mere credentials do not qualify a witness as an expert, but that he must have "shown such familiarity with the subject upon which he was being interrogated as to entitle him to express the opinion called for." *Hunt v. Bradshaw,* supra at 107.

Furthermore, despite the fact that both physicians who testified on behalf of the plaintiff could testify that they believed that the burns resulted from radiation therapy, absent credible evidence on the standard dosage in the treatment of plaintiff's condition and a demonstration that the result came about from a negligent failure to follow that standard, opinion evidence on the question of defendants' possible negligence was without proper basis or relevance.

The order of the court below should be reversed, and the appellants granted a new trial.