Opinion by
 

 Hoffman, J.,
 

 This is an appeal from the denial of appellant’s motion for a new trial, following a jury verdict in favor of appellee hospital. Appellants contend that the lower court committed reversible error by (1) refusing to allow a medical doctor to give testimony as to the accepted standards, customs, and practice for hospital care of psychogenic patients, (2) refusing to allow a licensed practical nurse to give testimony as to the accepted standards for nursing care of psychogenic patients, and (3) refusing to permit a licensed practical nurse to give her education, experience, and other qualifications to establish her expertise.
 

 On November 15, 1965, appellant Lela Taylor, age 64, appeared to be ill and acting abnormally. Relatives called the family doctor, and he came to Mrs. Taylor’s home. After observing that Mrs. Taylor was disoriented, the doctor arranged her admission to appellee hospital the same day. The family doctor turned Mrs. Taylor over to Dr. Hendrik DeKruif, who, upon her admission to the hospital, arranged an examination and acted as her physician while she was in the hospital. The admitting nurse and Dr. DeKruif were apparently informed by the family doctor that Mrs. Taylor’s behavior had been somewhat unusual and that closer than usual patient observation was in order.
 

 Dr. DeKruif made an initial tentative diagnosis of “arteriosclerosis.” Routine tests were ordered and the patient’s conduct and history for November 15 and 16 were not overtly abnormal. In the early morning of
 
 *20
 
 November 17, Mrs. Taylor became restless and confused, and she could not sleep. She was given light medication, and for the remainder of that day she appeared relatively normal. In the evening of November 17, at approximately 10:00 p.m., Mrs. Taylor went into a treatment room not normally used by patients and attempted to block nurses from approaching her by holding the door closed. The nurses took her into custody and noticed that she seemed confused and disoriented. Two nurses escorted Mrs. Taylor back to her room.
 

 Dr. DeKruif was called by telephone, and he authorized nurses to apply restraints to keep her in bed until he could arrive at the hospital. The restraints applied consisted of ankle and wrist straps fitted around her extremities and fastened to the bed and a posey belt fitted around the waist and then tied to the bed. A nurse’s aide was left with her for a short per riod until she calmed down and was resting quietly. Ten or fifteen minutes after the aide left the room, Mrs. Taylor was discovered out in the middle of the street in front of the hospital and was brought back to the hospital by nurses with some of the restraints still dangling from her extremities.
 

 An investigation revealed that the screen in Mrs. Taylor’s room had been removed, and she apparently jumped out the window into a snow bank, fracturing a bone in her heel and her pelvis. She was transferred to St. Francis Hospital in Pittsburgh the next day and there treated medically and psychiatrically.
 

 Mrs. Taylor could not explain why or how she had leaped from the hospital window. She testified that she had no recollection of being in the hospital or the accident.
 

 At trial plaintiff-appellants called Dr. Robert Tuby to the stand, qualified him as an expert witness, and asked him the following hypothetical question: “With
 
 *21
 
 reference to the hypothetical question and the hospital records which I have asked you to look at in addition, do you have an opinion whether treatment and care rendered Lola Taylor was, by the Spencer Hospital November, 1965, was in accordance with accepted standard customs of hospital practices?” Dr. Tuby replied affirmatively and then testified as to his opinion: “In my opinion the Spencer Hospital deviated from the accepted standard custom and practice in the handling and treating of Mrs. Taylor in that, when she evidenced psychogenic standard [sic], her psychogenic condition and the fact stated in the hypothetical question that she was wandering in the hallway and that she was agitated and that Dr. DeKruif ordered restraints and that Initially [the family doctor] told the nurse on admission that she was to watch her carefully for psychiatric condition, that she should have been attended at all times and that if they couldn’t attend her at all times that they should have put her in a room where she couldn’t get out, which would be a security room, which apparently, they did have in the hospital. Now if that security room was occupied and could not be spared at the time and they couldn’t handle her, they didn’t have enough nurses or aids [sic] to watch the patient at all times, I think they should have transferred to a hospital that did have facilities to watch her at all times.
 

 “In other words, I feel that the nursing staff did not take the necessary measures to prevent her from getting out of her restraints and going out the window.”
 

 Dr. Tuby was later cross-examined by the attorney for appellee hospital, and after this cross-examination the attorney renewed an earlier objection to the qualification of Dr. Tuby as an expert witness on nursing care. The trial judge at this point sustained the ob
 
 *22
 
 jection and granted the motion of appellee’s attorney to strike all of Dr. Tuby’s testimony expressed as an opinion based upon his expertise in either nursing service, care, or hospital administration. This ruling was apparently the result of testimony elicited on cross-examination which indicated that Dr. Tuby had never been a hospital administrator and had never been responsible for nursing care in a hospital.
 

 The trial judge in his opinion stated that “[j]ust because Dr. Tuby had worked with nurses in the past, had taught them limited
 
 medical
 
 courses, had served on the medical staff of hospitals in the past, was presently a staff ‘consultant’ at a hospital, did not give him the knowledge, understanding, training or judgment to opine that the hospital and nursing staff deviated from acceptable hospital and nursing standards in their handling of Mrs. Taylor.
 

 “While the nursing and medical professions are compatible, their roles, duties, training standards and practices in treating and caring for patients are separate and distinct fields and being an expert in one profession does not necessarily qualify one as an expert in the other.” [emphasis in original]
 

 Appellants contend that not allowing a medical doctor to give testimony on the standard of nursing care suggests that nurses are permitted to practice in some areas of medicine from which doctors are excluded. We agree with appellant and believe that the lower court erred when it granted the motion to strike Dr. Tuby’s testimony.
 

 A witness should be qualified as an expert if he or she “has any reasonable pretension to specialized knowledge on the subject under investigation . . . and the weight to be given to his evidence is for the jury.”
 
 [1]
 
 
 *23
 

 Moodie v. Westinghouse Electric Corporation,
 
 367 Pa. 493, 501, 80 A. 2d 734 (1951), citing
 
 McCullough v. Holland Furnace Co.,
 
 293 Pa. 45, 49, 141 A. 631 (1928). Whether the qualifications of a witness justify the admission of his testimony as that of an expert is a question of discretion for the trial judge.
 
 Flavin v. Aldrich,
 
 213 Pa. Superior Ct. 420, 423, 250 A. 2d 185 (1968). Where, however, the trial judge commits clear error, that error will constitute reversible error on appeal.
 
 Flavin v. Aldrich,
 
 supra;
 
 Hughes v. Hanna,
 
 187 Pa. Superior Ct. 466, 144 A. 2d 617 (1958).
 

 Wigmore, in his well known treatise on evidence, has discussed the requirements of special experience on medical topics. Though he was referring to whether a general practitioner could testify on matters within the purview of available specialists, his statement is apposite in the circumstances of the present case: “The liberal doctrine should be insisted on that the law does not require the best possible kind of a witness, but only persons of such qualifications as the community daily and reasonably relies upon in seeking medical advice.” 2 Wigmore on Evidence, Testimonial Qualifications, §569, 3d Ed. (1940).
 

 In the instant case Dr. Tuby, on cross-examination, indicated that the practice of medicine and nursing
 
 *24
 
 were two professions which, were so interwoven that they would have to be considered part of a unitary medical profession. In answer to the question “And do you believe that every doctor is an expert in nursing service? Every qualified doctor, let’s say?”, Dr. Tuby stated, “I would say a doctor knows enough about nursing service to be an expert, yes, because he’s in contact with them all the time. He depends upon the nurses to carry out the treatment of his patients and to watch and care for his patients.”
 

 It is evident that the nurses in the instant case made decisions involving the medical treatment of Mrs. Taylor, and that these decisions were not uniquely administrative or outside the knowledge of a medical doctor. All areas of medical expertise within the knowledge of nurses are also within the knowledge of medical doctors. This issue has never been considered or decided before in Pennsylvania, but our Supreme Court has, by implication, approved the use of the testimony of a medical doctor to establish acceptable standards of nursing care.
 
 Baur v. Mesta Machine Co.,
 
 405 Pa. 617, 176 A. 2d 684 (1961).
 
 [2]
 

 Appellants’ second specification of error is that the lower court refused to permit a licensed practical nurse to give testimony as to the accepted standards for nursing care of psychogenic patients. Appellants called the nurse to testify as to appellee’s failure to keep a nurse
 
 *25
 
 with Mrs. Taylor and to the improper application of restraints. The basis for appellants’ claim that the restraints were improperly applied was the interposition of a washcloth between the leather restraint and Mrs. Taylor’s wrists.
 

 Appellants made an offer of proof which disclosed that the licensed practical nnrse had worked as a nnrse for a hospital, had handled all types of hospital patients, including mental or psychiatric patients, and had attached security devices to patients in the course of her duties. The trial judge did not allow the nurse to testify because he believed that she was being called to testify regarding acceptable
 
 registered
 
 nurse practice and procedures.
 

 A registered nurse is a person who “engages in the ‘.Practice of Professional Nursing,’ within the meaning of [The Professional Nursing Law, 63 P.S. §211 et seq.], who performs any professional services requiring the application of principles of the biological, physical or social sciences and nursing skills in the care of the sick, in the prevention of disease, or in the conservation of health.” 63 P.S. §212(1). “The ‘practice of practical nursing’ means the performance of selected nursing acts in the care of the ill, injured or infirm under the direction of a licensed professional nurse, a licensed physician or a licensed dentist which do not require the specialized skill, judgment and knowledge required in professional nursing.” The Practical Nurse Law, 63 P.S. §651 et seq.
 

 If the application of security restraints to mentally disturbed or disoriented patients is a matter requiring the “specialized skill, judgment and knowledge” of a registered nurse, we would not hesitate to uphold the decision of the lower court. It is apparent, however, that no such evidence was produced, and the implica
 
 *26
 
 tion from appellants’ offer of proof is that the licensed practical nurse was permitted to attach security restraints. The lower court’s failure to allow the nurse to testify as to her qualifications prevented that court and our Court from discovering the scope of expertise of a licensed practical nurse, and of this nurse in particular. If a duly qualified practical nurse is permitted by law to do certain acts, and she has in fact done those acts or is familiar with them, there is no reason why she could not testify as an expert witness as to the proper method of performing those acts.
 
 Moodie v. Westinghouse Electric Corporation,
 
 supra;
 
 Commonwealth v. Morris,
 
 205 Pa. Superior Ct. 105, 110-111, 207 A. 2d 921 (1965).
 

 For the above reasons the order of the lower court denying appellants’ motion for a new trial must be reversed.
 

 Weight, P. J., and Jacobs, J., would affirm on the opinion of President Judge Thomas.
 

 [1]
 

 Qualification of a witness as an expert has been considered proper in the following cases:
 
 Commonwealth v. Morris,
 
 205 Pa.
 
 *23
 
 Superior Ct. 105, 207 A. 2d 921 (1965) (hospital interne may qualify as expert medical witness) ;
 
 Moodie v. Westinghouse Electric Corporation,
 
 367 Pa. 493, 80 A. 2d 734 (1951) (mechanical and electrical engineer who was familiar with air blowers qualified as expert witness to testify concerning particular blower of a type which engineer had never designed or tested);
 
 Keefer v. Lombardi,
 
 89 Pa. D. & C. 406,
 
 aff’d,
 
 376 Pa. 367, 102 A. 2d 695 (1954) (general contractor qualified as expert witness on causation of damages in vicinity of blasting, though without college degree or special training) ; and
 
 Benshetler v. Palumbo Motors, Inc.,
 
 380 Pa. 353, 110 A. 2d 207 (1955) (piano instructor permitted to testify as to ability of minor plaintiff to play piano professionally after injury to finger).
 

 [2]
 

 Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices. It is, however, for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness.
 
 Moodie v. Westinghouse Electric Corporation,
 
 supra. Witnesses having “any reasonable pretension to specialized knowledge” on a given subject should be allowed to testify as expert witnesses even though they are not the “best possible witnesses” available.