433 A.2d 40

WHISTLER SPORTSWEAR, INC., Appellant,

v.

Richard RULLO and William Rullo, Executors of the Estate of Antonetta Bruno and Richard R. Rullo, Esther L. Rullo, William A. Rullo and Helen E. Rullo.

Superior Court of Pennsylvania.

Submitted Nov. 14, 1980.

Filed July 24, 1981.

Petition for Allowance of Appeal Denied Nov. 9, 1981.

232

234

David L. Glassberg, Hazleton, for appellant.

James B. Yelovich, Somerset, for appellees.

Before PRICE, DiSALLE and MONTEMURO, JJ.

MONTEMURO, Judge:

December of 1974 was an unusually snowy month in the area surrounding Hollsopple, Pennsylvania. In early December two feet of wet and heavy snow was deposited on the area, and in Mid-December an additional sixteen or seventeen inches descended. On December 22, 1974, the roof of a small garment factory building owned by defendant-appellees collapsed. Fortunately the factory was closed and no personal injuries were involved, but the tenant manufacturer lost its equipment from the collapse and the subsequent exposure of the machinery to the weather.

The manufacturer filed suit in Trespass and Assumpsit against the estate of the original owner and her nephews, the present owners, and their wives. The theory set forth in the pleading was that damage and loss to the manufacturer was the result of negligence on the part of appellees in failing properly to construct or to maintain the roof. Damage was requested in the amount of $110,816.23 "forced replacement costs."

Appellees responded with Answer, New Matter and Counterclaim denying negligence and averring that the damage to the roof was caused by appellant's failure to keep the building heated as provided in the lease, and counterclaiming for replacement cost of the roof.

The case was argued before a jury for six days. The causes against the estate of the original owner and the wives of the present owners were withdrawn during the trial. The jury returned a verdict for the defendant-appellees, but permitted no compensation on the counterclaim.

Eighteen points of error were originally raised by appellant in the Motion for a New Trial, but only ten of these were retained for argument in the instant appeal. This court will address the issues seriatim.

■ The first question concerns a ruling of lower court disallowing use of a paragraph from defendants' New Matter as an "admission of fact." The paragraph at issue reads as follows:

No deficiency in the design, planning, supervision or observation of construction or construction of said building was the proximate cause of the injury or damages alleged by the plaintiff, and, therefore, any cause of action against William Rullo and Richard Rullo, individually, since they participated in the designing, planning, supervision and observation of construction of said building may be maintained because any such action is barred by the Act of December 22, 1965, P.L. 1183, Section 1, 12 P.S. Section 65.1 (R. 21a).

Appellant contends that it was entitled to read this into the record as a "judicial admission" of a fact contained in a pleading which "cannot be contradicted by the party that has made" the statement. *Wigmore on Evidence*, § 1603(2) (3rd Ed. 1940).

Additionally appellant claims that its cross-examination of appellee was restricted improperly when one of the defendants was not permitted to be cross-examined on the same paragraph. This error is alleged to be of "constitutional

magnitude" because credibility of a witness can always be impeached by a prior contradictory statement. Appellees, in contrast, emphasize the fact that paragraph 40 was an attempt to invoke a statutory defense, couched in the language of the statute, and was never admitted as a "fact" *per se*. It appears that counsel for both parties had agreed at the outset of the trial to omit the issue of the underlying statute from consideration in the case.

At the outset, this court feels compelled to point out that paragraph 40 is confusing grammatically, apparently as the result of a typographical error and a missing negative. Additionally, sudden mention of a statute never argued to the jury as a factor in the case could compound the confusion. The wisdom of placing an unintelligible statement before a jury would be suspect under most circumstances.

Review of both of appellant's arguments as to the impropriety of excluding paragraph 40 forces the reader to notice that the citations imply that *contradictory* prior statements of a party are admissible, either to prove a fact or for impeachment. The record shows that the defendants admitted at some length to their participation in the planning and construction of the building at the behest of their aunt, the original owner. The jury was afforded far more detail than paragraph 40 supplied, and the testimony, unlike the paragraph, was not confusing.

The lower court properly emphasized the discretionary nature of its decisions concerning "scope, extent, order and manner" of cross-examination of defendants. The testimony permitted fully covered defendants' participation in the construction of the factory. The paragraph refused admission was not contradictory to that testimony and there was no onus on the trial judge to admit it for impeachment purposes or as a "judicial admission." As a practical matter, the sudden mention of a statute whose applicability was never explored by counsel and the grammatical uncertainty of the paragraph made it most unsuitable for presentation to a jury absent any compelling need for its admission. The trial judge was well within his discretionary powers in the exclusion of paragraph 40 from evidence.

The gist of the second issue raised by appellant was that the civil engineer testifying as an expert for appellees was not qualified to speak on roof failure and that the hypothetical posed to him included facts unsupported on the record.

The lower court's opinion states that the witness presented "impeccable qualification" as an expert engineer and upon review of the record, this court must agree. The fact that his area of expertise was not specifically in roof design was by no means a fatal flaw once the actual impact of his testimony is reviewed.

His inspection in June, long after the snows had melted, still revealed the twisting of the concrete support columns which led to their "shearing" and thus to the collapse of the support for the roof. This disaster, he attributed to two factors: (1) several unusually heavy snowfalls depositing untoward weight upon the roof and (2) a lack of adequate heat in the building which permitted not only a long-time retention of the heavy snow load but also, most importantly, an *uneven distribution* of that load due to melting in certain areas exposed to sun.

He repeatedly stated that the failure was caused by "torque" of the non-resilient concrete support columns due to the uneven stresses of a heavy, unequal load, and that the "load would be the same regardless of spacing [of the building's trusses]."

The appellant naturally stressed evidence that the trusses were spaced more widely than the original plans had called for; it attributed the roof's collapse to this circumstance and produced an expert to testify to that purpose. However, this alternate version of expert opinion did not jar appellees' expert's opinion that it was not the *roof*, but the *supports* that had failed, and that a roof that had survived the area weather for fifteen winters while the building was heated had proved its adequacy under normal conditions.

Upon review, none of the above testimony relies entirely upon a "vis major" or an "Act of God" defense, nor upon knowledge of roofing *per se*, but rather upon knowl-

edge of engineering principles of stress and resiliency and an ability to interpret the evidence left in the aftermath of the physical collapse. For this work, appellees' expert was highly qualified. The lower court has a broad grant of discretion with regard to expert testimony, as even appellant concedes, and no abuse of that discretion is apparent here.

Turning to the question of whether the hypothetical question posed to appellees' expert was supported by testimony, this court discovered no material discrepancies. True, the hypothetical included the "original plans" for the factory building in its wording, however, the very next sentence made reference to trusses "four feet on center," the distance repeatedly established by testimony. The expert could not have been misled to his conclusion, nor could the jury have been confused.

The record varies as to the length of time that electrical service to the Hollsopple community was interrupted, but deliveries of propane, the heating fuel, were established as approximately one-quarter of the gallonage of the comparable period the year before.

The expert based his opinion on the givens of heavy snowfall and inadequate heat, both of which were supported by testimony. However, he stressed the importance of his own observations of the on-site evidence of the wreckage, and the relative unimportance of the details of the hypothetical in reaching his opinion.

A hypothetical need not be based upon evidence conclusively proven; the rule is rather that the evidence must "tend to establish" the assumptions. *Howarth v. Adams Express Co.*, 269 Pa. 280, 112 A. 536 (1921); *Keilbach v. Metropolitan Life Insurance Co.*, 157 Pa.Super. 590, 43 A.2d 652 (1945). Testimony on this record clearly "tends to establish" the assumptions of the hypothetical. The lower court clearly did not permit presumptions built on presumptions leading to "irresponsible speculation," *Auerback v. Philadelphia Transportation Co.*, 421 Pa. 594, 221 A.2d 163

(1966), but rather refused to strike the opinion testimony of a qualified expert based upon evidence reflected in the record. There was no abuse of the discretion permitted the trial judge.

The third issue involves the use of a document used to refresh recollection. An investigator for the defendants had prepared a seventeen-page report in September of 1975. At trial in late 1979, one of the persons interviewed in 1975 gave testimony contradictory to his earlier report. The investigator then took the stand and used certain pages of his report to refresh his memory as to the original answers given in 1975. An excerpt of the pages covering the interview with the one witness being impeached was offered to opposing counsel, who objected and demanded the entire seventeen-page report. Counsel for defendants refused to expose his entire "work product" to appellant for a "fishing expedition," but offered to permit the court *in camera* to read the report to ascertain that no portions relevant to the interview in question had been withheld.

This altercation appears from the record to have been confined to a squabble between counsel; a formal ruling by the court was neither requested nor made. Appellant's counsel eventually stated that the situation had "become too confusing" and voluntarily continued his cross-examination of the witness. (N.T. 421)

 An appellate court will not ordinarily reverse the court below for not doing what it was not asked to do, but will treat matters not objected to in the court below as waived. *Gordon v. Colonial Northeastern Trust Co.*, 312 Pa. 73, 167 A. 773 (1933), *Logan v. Cherrie*, 444 Pa. 555, 282 A.2d 236 (1971).[1] The circumstances under the instant facts are

1. That appellant would be entitled to the entire report is doubtful in any event:

Finally, an examination of the record persuades us that the District Court properly exercised its discretion. The Court authorized no general "fishing expedition" into the defense files or indeed even into the defense investigator's report. . . . Rather, its considered ruling was quite limited in scope, opening to prosecution scrutiny only the portion of the report that related to the testimony the

far from being compelling enough to induce this court to reverse the decision of the trial judge that the matter was waived.

■ Appellant next complains that a bill of sale listing a number of items which were purchased from a prior tenant of the factory building by the appellant should have been excluded from evidence as an exhibit. The document had been produced by appellant itself in response to discovery, but appellant objected to its use at trial on grounds that (1) no witness was called to authenticate the document and (2) the age of the bill of sale (seven years) precluded its use for current market values. The trial judge permitted the document's use for impeachment and allowed it in evidence as an exhibit.

There appears to be virtually no law in this Commonwealth directly on point with the issues involved. However, as to the admissibility of a bill of sale, *Wigmore on Evidence*, Vol. VII, § 2160 at p. 777 (1978) has considered production of documents in a wider context that proves helpful on the instant facts:

... Documents produced from private custody: (1) Opponent producing on notice; ... During the vogue of the attesting witness rule, an unsound doctrine obtained a partial vogue that an opponent producing a document from his possession on notice admitted its genuineness, so that the attester need not be called. ... Obviously the mere possession of any document, especially one purporting to be signed by a third person, should not be treated as an admission of genuineness.

But, apart from any principle of admissions, and looking only at the circumstantial value ... of the party's possession, may it not fairly be said that *a person's possession of documents purporting to be made by himself* and, particularly, of documents *used and acted on by him in the ordinary conduct of his business*, is sufficient evidence of

investigator would offer to discredit the witness' identification testimony. *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)

their genuineness to justify their reception? This rule may be justified only by the inference thus drawn from daily experience, but also by the fact that the burden of disproof of genuineness, if it is actually disputed, can the more readily be placed in such a case on the party himself. (Emphasis in original)

Therefore, we conclude that while a document upon which the endorsement was a matter of vital importance would have required authentication, the lower court was justified in permitting use of a document produced in the ordinary course of business for impeachment. This was not a document requiring interpretations as to the intent of the parties; no ambiguity was claimed; its value did not rely upon a signature affixed to it. The party that had produced the document did not attempt to disprove its genuineness but merely tried to shift the burden of authentication onto appellee. *Wigmore's* approach to the matter as set forth above provides an answer compatible with common sense as well as law, and we therefore hold that the lower court exercised due discretion in not insisting that appellee authenticate the bill of sale given it by appellant during discovery.

■ As to the contention that the prices on the bill of sale were too remote to be relevant, in other circumstances it has been settled that the decision to admit or not admit evidence of earlier purchase prices is one for the determination of the trial court based upon the facts peculiar to a case. "Remoteness" as acknowledged by the court in *Klick v. Commonwealth Department of Transportation*, 20 Pa.Cmwlth. 627, 342 A.2d 794 (1975) to be a problem "our appellate courts have struggled with" and it concluded that no "ipso facto" conclusion could be made. The court there emphasized the trial court's "broad discretion" in such matters.

The instant case is unlike the cases cited by counsel in that it does not concern real estate values, but cutting tables, shelving, presses, and a number of sewing machines, all purchased from the prior tenant of the building by the appellant at the time the tenancy changed hands. The

appellant claimed damages for lost equipment at hefty replacement values. The bill of sale was used for impeachment purposes only, to show that seven years prior to the disaster some thirty-five of the sewing machines, identifiable by manufacturer's numbers, had been bought along with other equipment for a sum certain which was considerably smaller than the claimed replacement value.

■ Pennsylvania finds evidence relevant "when it tends to establish facts in issue," *Leroi v. Civil Service Commission of City of Philadelphia*, 34 Pa.Cmwlth. 190, 382 A.2d 1260 (1978), or when it "in come degree advances the inquiry and thus has probative value," *Bowers v. Garfield*, 382 F.Supp. 503, aff. 503 F.2d 1398 (Pa.1974). Certainly a bill of sale at a low figure for items identical to those for which a high value is claimed is relevant for impeachment under the above test.

■ Relevant evidence is nonetheless excluded "if its probative value is substantially outweighed by the danger of unfair prejudice or confusion," *Carter v. Hewitt*, 617 F.2d 961 (Pa.1980). "Prejudice," of course, does not mean "detrimental to a party's case" but rather "an undue tendency to suggest decision on an improper basis." The court below determined that purchase price of equipment subsequently used for seven years until its destruction was one proper basis for estimating loss and that a jury of reasonable persons could deal with concepts of purchase price, depreciation, and replacement value.[2] The trial judge permitted counsel to challenge the reliability of the bill of sale as a basis for decision to the jury itself in final arguments. The court's discretion was reasonably applied to the actual circumstances of the case and its decision will not be disturbed.

The next two allegations of error involve expert witnesses: in one instance the trial judge prohibited an expert witness who was an electrical contractor from testifying to the cost of electrical damage because he was not personally aware of local wage and price scales; in the other instance

2. In fact, the jury's verdict did not utilize these concepts as no compensation was awarded.

the court did permit testimony of a long-time sewing machine dealer as to value of industrial sewing machines.

Again, it is necessary to stress the discretionary nature of the lower court's decisions regarding admission of testimony. In the instant case, the record shows that the electrical contractor admitted to variations in pricing from one locale to another and indicated that his own estimates would be based on union flyers and similar written materials. The next day a local contractor was produced by appellant and was fully examined on his personal knowledge of such matters. In contrast, the sewing machine expert testified that there were no local variations in the cost of industrial sewing machines and, although his last sale in Pennsylvania had been in 1973, this was within a year of the occurrence of the disaster.

■■■■ The record reflects that the court considered the facts carefully and weighed the information that the garment industry is centralized in certain areas. Machines are purchased at urban centers and shipped, when necessary, to outlying purchasers.[3] There are, as a consequence, no "local" salesmen to qualify as experts. The reasoning of the trial judge in permitting testimony of one expert while rejecting the other seems entirely adequate and forms no basis for reversal.[4]

■■■■ Appellants next assign as error that the trial court improperly curtailed cross-examination on a "Direct Issue." Factually, this appraisal seems inaccurate. The original owner of the factory building was elderly and asked her nephew to oversee the progress of the building. Afterward

3. This entire project was an effort on the part of Antonetta Rullo, the original owner of the property, to bring small industry and jobs into the Hollsopple area.

4. The latitude allowed the lower court by the appellate court in decisions regarding expert testimony is traditionally so broad that Standard Pennsylvania Practice, Vol. 9, § 87 "Admission or Exclusion of Evidence" and cases cited therein, states that once such testimony has been admitted, if the witness has any claim as an expert, the appellate court "will resolve its own doubts in favor of the ruling of the court below."

she deeded the building to her nephews, reserving life tenancy. Later still she apparently asked them, with their wives, to join in obtaining a mortgage on the property.

Appellant's contention is apparently two-fold: (1) that cross-examination would prove that the nephews were owners when they denied ownership and (2) that this "prior inconsistency" constituted "substantive evidence" under the circumstances.

Ownership of the factory by the nephews was admitted as early as their Answer. A review of the Record shows that one defendant-appellee was genuinely confused about his aunt's transactions as to the transfer of the property and the mortgage. Apparently, the aunt effected the transfer without consulting her nephews, and although they co-signed with her for her mortgage loan, the appellee testifying confused that occasion with other similar co-signings when questioned.[5]

Even the printed record reflects honest, if befuddled, responses. Assumedly the trial judge and jury were able to appraise the demeanor of the witnesses involved even more accurately. The dates and the various involvements of the nephews were clearly on record and inconsistencies appear to have been inadvertent and easily cured. Any "substantive evidence" which might appear from further cross-examination could hardly be a "direct issue" as claimed by appellant.

The trial judge's refusal to expend more court time on this collateral issue was justified and cannot be deemed error.

The appellant next asserts that the lower court incorrectly incorporated disputed facts into his points for charge. Each of the paragraphs complained of stated that the placement of roof trusses at four foot intervals rather than two foot intervals was not "in and of itself proof" of (1) defendants' negligence or (2) the cause of collapse of the roof.

5. After refreshing his memory by discussion with his wife, the nephew-appellee offered as his best recollection that his aunt had gone to Italy with the mortgage money and had disbursed it to her late husband's relatives there. In any case, he and his brothers had not received the money.

The spacing of the trusses was fully explored on the record. The original plans apparently were designed for two-foot spacing of the trusses, but the building as finished actually had four-foot spacing, thus the wording in these disputed charges that recapitulates those facts was not challenged. The structural importance of the variation of the spacing was disputed, however. In essence, appellant here insists that the possibility existed that the jury might find that the four-foot spacing of the trusses was "in and of itself proof" of negligence or was the "sole cause of the collapse" of the roof. Appellee counters with a tortuous argument that the wording merely insists that defendants be found to be responsible for the placement of the trusses or that causation between placement and collapse be shown.

■ *Gilbert v. Korvettes, Inc.*, 457 Pa. 602, 327 A.2d 94 (1974), as cited by appellant unfortunately sheds no light on this question. It is an in-depth review of the *res ipsa loquitur* doctrine which conforms the version as used in this Commonwealth to the Restatement § 328D. The instant facts simply do not parallel that formula: as instances, the harm suffered was of a type that might happen absent negligence, conduct of both plaintiffs and defendants were under scrutiny as possible contributors to the harm, and "duties" of both parties were disputed. Therefore, how appellant reads *Gilbert*, supra, as supporting the raising of an "inference of negligence" is not apparent.

■ The trial judge has a duty to state accurately the law and to apply legal principles to facts without usurping the fact-finding function of the jury. *Russell v. Helm's Express, Inc.*, 221 Pa.Super. 292, 293 A.2d 78 (1972). Frankly, the language contained in the two paragraphs complained of does appear to skirt very nearly to the edge of permissible behavior by the court.

Technically, appellees' argument can be made, that *some* other element such as responsibility or causation would logically have to be added to the simple fact of spacing of the trusses to complete the legal requirements for negli-

gence. Technically, too, appellant's rejoinder that it was *possible* for the jury to hold negligence simply from the fact of the spacing would seem to be tenable. The record shows that evidence of the nephews' actual overseeing of this project from its inception and the unusual frequency and weight of snowfall during the period were explored at length before the jury. In fact, neither party was actually contending that the "mere" fact of spacing trusses at four-foot intervals *without more* was an issue.

A judgment is seldom reversed for error in the charge unless that error is the inclusion of "incorrect and misleading statements as to a material fact," *Raskus v. Allegheny Valley Street Railroad Co.*, 302 Pa. 34, 153 A. 117 (1930); *Connelly v. Kauffman & Baer Co.*, 349 Pa. 261, 37 A.2d 125 (1944). As discussed above, the material facts here are correctly stated. Where the error has worked no injury to the interests of the appellant, the judgment will not be reversed. *Murray v. Pittsburgh Athletic Co.*, 324 Pa. 486, 188 A. 190 (1937); *Susser v. Wiley, et al*, 350 Pa. 427, 39 A.2d 616 (1944). Again, as discussed above, the reasonable jury would be hard-pressed on the evidence submitted to consider truss-spacing *without more* as negligence or sole causation. No actual injury to appellant's cause appears, and this court will not reverse on the issue.

Appellants complained of the points for charge on two other grounds: (1) that the court improperly refused to read points regarding the contractual duties of a landlord in correcting defects in a rental property and (2) that the court erred in similarly refusing to include a charge on the responsibilities of the nephews as "beginners" in construction work.

The court accepted many of appellant's points for charge including those stating that a landlord "retaining control" of roof repair was responsible for damage resulting from negligent maintenance, and that the duty of care imposed more than cursory observation where proper and reasonable inspection would have revealed the defect. In fact, review of

appellant's suggested points for charge show that no less than twelve paragraphs were submitted on this same theme and that the seven accepted charges very adequately covered every legitimate point appellant could have made. A "fair and adequate understanding of both sides of the case" is the standard demanded in law, 9 Standard Pa. Practice § 208 "Review of Facts and Evidence in Charge" and cases cited therein. The trial judge presented appellant's charges most fairly and its "side" completely.

■ As to the charge requested on the responsibility of the Beginner Contractor, citing § 299A of the Restatement of Torts 2d, the language therein is obviously applicable to contract or quasi-contract, and has no relevance whatsoever to obligations running from a tradesman or professional to third parties appearing on the scene long after the services have been rendered. Again, proffered points of charge more nearly tailored to the facts and making a similar statement were accepted. Appellant had no valid cause of complaint in this regard.

The assignments of error are dismissed and the Order below is affirmed.

PRICE, J., concurs in the result.