## Lavish v. Archbold Ladder Co.

*Leah B. Perry* and *Robert M. Britton*, for defendants.

BERNSTEIN, *J.*, March 19, 1999—Plaintiffs Edward and Catherine Lavish filed this action against defendants Archbold Ladder Company and Goodbuys Inc. d/b/a Mr. Goodbuys on September 15, 1995. Plaintiffs sought damages against defendants for products liability, breach of warranty, and negligence resulting from plaintiff Edward Lavish's fall from a ladder manufactured by defendant Archbold and sold to plaintiffs by defendant Goodbuys. On January 16, 1996, a default judgment was entered in favor of plaintiffs and against defendant Goodbuys.

Trial began on March 9, 1998. On March 16, 1998, a jury rendered a verdict in favor of plaintiffs and against defendants in the amount of $200,000. Following the verdict, defendant Archbold timely filed a motion for post-trial relief, asking this court to grant judgment n.o.v., a new trial, or remittitur.[1] On April 15, 1998, this court granted plaintiffs' petition for delay of damages, molding the verdict to $220,116.50. On December 3, 1998, post-verdict motions were argued. On January

---

1. Defendant Archbold Ladder Company's motion for post-trial relief, ¶¶1-3.

19, 1999, this court granted defendant's motion for post-trial relief and ordered a new trial as to defendant Archbold only. From this order, plaintiffs timely appealed.

The first issue presented is whether this court erred in allowing plaintiffs' expert, Dr. Scott A. Snyder, to testify after Dr. Snyder conceded that he was not an expert in wood. The second issue presented is whether this court improperly permitted plaintiffs' counsel to cross-examine John Hatfield, the former president of Archbold Ladder Company, on prior accidents involving defendant Archbold. For the reasons that follow, the court found Dr. Snyder unqualified to provide expert testimony concerning the critical issues in this case, and the ruling granting a new trial should be affirmed.

In 1988, plaintiff Edward Lavish purchased a standard A-frame wooden ladder, manufactured by defendant Archbold, from defendant Mr. Goodbuys.[2] On May 4, 1995, plaintiff used that ladder to remove caulk from newly installed windows on his house.[3] While standing on the third step of the ladder and working on the lower left-hand window, the ladder broke and plaintiff fell to the ground.[4] He was taken to JFK Hospital where he remained hospitalized until May 6, 1995.[5]

At trial, plaintiffs' only expert was Dr. Scott A. Snyder, an expert in mechanical engineering, product design, and failure analysis.[6] Dr. Snyder testified that the ladder was defective because of the wood. Dr. Snyder demonstrated the wood to the jury on direct examination:

---

2. N.T., 3/10/98, at 46.
3. N.T., 3/10/98, at 50.
4. N.T., 3/10/98, at 55-56.
5. N.T., 3/10/98, at 58-59.
6. N.T., 3/11/98, at 162.

"In addition to the design, the weakness in the design, the wood itself had several characteristics which would make it weaker than a normal piece of wood; one being that, in fact, around this—you can't really see it on the other side. The grain, which—ideally, you'd love to have straight grain in this design. That would be the strongest piece of wood with the highest strength aligned with the way this is building. This grain deviates from straightness, and even more so on the other side. We can turn this around. I know it's difficult to see. At this corner, this grain deviation exceeds what would be an acceptable slope, and provides another irregularity around this joint (indicating).

"The second thing is, if you look at the cross-section of this piece, and you follow—you imagine, in a tree growing like this, you follow these growth rings; then you trace these out (indicating). They form an ellipse, rather than a circle. What that's indicative of is something—a normal tree would grow in a circular growth pattern. Something was stressing in this particular piece of lumber; whether it was a branch growing or the tree was leaning over. What that's called is compression wood. And the indication of compression wood also means that it was a weaker piece of wood.

"The other evidence of that compression was an exceptionally high density of this piece of wood, way more than average; 30 to 40 percent higher than a typical piece of southern yellow pine. That, alone, with the elliptical growth rings, indicates compression. So that also weakens the design.

"Then the third thing was the choice of lumber cut in this piece. Once again, if you imagine a cross-section of a tree and you're looking down at it, with the growth rings coming out, there's a couple ways you can cut it, cut a board out of a tree. One is, you can cut it

tangent to those growth rings, so you cut it off the top, like that (indicating). What you would see on the side is a sort of grainy cross-section of several growth rings. You can cut it this way, which is called the quarter sawn. The way I just talked about was flat sawn. Quarter sawn would be right through the center, and perpendicular to the growth ring; and you'd see grains like this (indicating). Then there's in-between cuts, which may refer to rift sawn or bastard sawn. Why that's relevant is, the degree in this direction, as you—perpendicular to the growth rings out, it's stronger in that direction than it is tangential to the growth rings. So if you were going to bend the board, you like to bend it into the direction as the growth rings head out, rather than along the circle of growth rings. So the way this wood was cut was actually rift sawn. It was not flat sawn. So that, in fact, also created a weaker piece, in bending that, than you'd like to have, ideally. In fact, many of the ladders inspected—I went out and looked at ladders in stores. And most of the pieces were flat sawn, that I saw in those cases." [7]

Dr. Snyder continued to offer detailed testimony on the characteristics of the wood that caused the ladder to break:

"Mr. Reger: . . . could you tell the jury what is compression wood, in English?

"The Witness: It's basically prestressed wood.

"Mr. Reger: What does that mean?

"The Witness: There's some external; force acting within the tree or on the tree that—to cause the wood to, essentially, grow with some compressive force on it.

7. N.T., 3/11/98, at 181-84.

"Mr. Reger: Dr. Snyder, is compression wood weaker or stronger than noncompression wood?

"The Witness: It would be weaker.

"Mr. Reger: Now you mentioned something about the growth rings. What is the effect of the growth rings in this particular case upon the strength of the ladder?

"The Witness: the number of growth rings or . . .

"Mr. Reger: Or the growth ring and, actually, the gain deviation as well.

"The Witness: Well the growth rings were just an element or evidence of compression wood; so they point to compression wood. The grain deviation itself, as you know, if I take this grain and, now, essentially tilt it, you can imagine it starts to get weaker.

"You know, if I had a tree grain running like this, essentially, I don't have my strongest part of the wood aligned, because wood is an orthotropic material; and what that means, in simple terms, is, it has different properties and different directions. So you want the grain aligned with the highest load path. So as I deviate off of that, I'm losing strength in this piece. And it could be as much as 30, 40 percent in this case. . . .

"Mr. Reger: Dr. Snyder, referring you, in particular, to the fracture, I am pointing to an area—I will twist it toward the jury. (Pause.) Right here. See my finger (indicating)?

"The Witness: Yes.

"Mr. Reger: What does that show?

"The Witness: That's a—that's a grain deviation. It's beyond what we would consider acceptable.

"Mr. Reger: What is the effect of a gain deviation? Does it make it stronger or weaker?

"The Witness: Weaker.

"Mr. Reger: Now you also mentioned elliptical patterns in the wood.

"The Witness: Right.

"Mr. Reger: Could you show up close, to the jury, what you're referring to?

"The Witness: Yeah. Once again, if you—if you trace these growth rings out, and basically laid the signature onto a shape, it would be an elipse [sic]; not a circle. This is an elliptical pattern. And, once again, that indicates some external force acting on the tree of compression wood.

"Mr. Reger: What is the effect of the external force? Does it make the wood stronger or weaker?

"The Witness: It's weaker." [8]

Dr. Snyder specifically testified that, in his opinion, the nature of the wood used in the ladder that plaintiff purchased caused the ladder to be defective. On direct examination, he said:

"Mr. Reger: Dr. Snyder, you're not saying, are you, that all wood ladders are defective, are you?

"The Witness: No, I'm not.

"Mr. Reger: What was it about this ladder that caused the failure?

"The Witness: Once again, the weakness, the inherent weakness in the design, coupled with the weak characteristics of this wood." [9]

And later he said:

"Mr. Reger: In your analysis of the ladder, in your opinion, did grain deviations contribute to the failure of this ladder?

"The Witness: I believe so." [10]

---

8. N.T., 3/11/98, at 187-90.
9. N.T., 3/11/98, at 184-85.
10. N.T., 3/11/98, at 195.

Dr. Snyder holds a bachelor's degree in mechanical engineering, a Ph.D. in engineering, and a professional mechanical engineering license.[11] For nine years, he has designed products and subsystems in the aerospace industry. He presently serves as a mechanical engineer for Lockheed Martin Space Division. Dr. Snyder has credentials in failure analysis and teaches product design at the graduate level at the University of Pennsylvania.[12]

Dr. Snyder testified that he is familiar with the physical properties of materials, including wood, steel, and graphite. Although he has never designed any wood products or ladders, he testified that he has designed products more complex than wooden ladders and has worked with materials with properties similar to wood.[13] Dr. Snyder has never worked for any company manufacturing wooden ladders. He is generally familiar with normal design verification test practices, but he conceded that he is "not specifically" familiar with design verification test practices for wooden ladders.[14]

During voir dire on qualifications, Dr. Snyder admitted that he has no expertise in either wood or wood technology. Dr. Snyder testified on cross-examination:

"Mr. Toensmeier: [Dr. Snyder], none of your degrees have anything to do with wood, do they, sir?

"The Witness: No.

"Mr. Toensmeier: *Do you consider yourself to be an expert in wood, wood technology?*

"The Witness: *No.*" [15]

---

11. N.T., 3/11/98, at 153-54.
12. N.T., 3/11/98, at 155-57.
13. N.T., 3/11/98, at 160-61.
14. N.T., 3/11/98, at 175-76.
15. N.T., 3/11/98, at 171-72. (emphasis added)

Dr. Snyder made further concessions concerning his qualifications:

"Mr. Toensmeier: Have you ever published any articles in any refereed professional journals on wood products or wood technology?

"The Witness: No, I have not.

"Mr. Toensmeier: Have you ever published any texts or any chapters in texts on wood or wood technology?

"The Witness: No." [16]

Dr. Snyder also conceded that he has neither taught nor lectured on wood, wood products, or wood technology. Neither has he ever consulted on the design of wood products.[17]

In addition to conceding that he is not an expert on wood products, Dr. Snyder admitted that he lacks expertise in ladder design or manufacturing. He testified:

"Mr. Toensmeier: Do you consider yourself an expert in ladder manufacture, and design ladders?

"The Witness: I consider myself an expert in design, product design.

"Mr. Toensmeier: I understand that. *My question is, do you consider yourself an expert in ladder manufacturing and design of ladders?*

"The Witness: *Not specifically ladders.*" [18]

Following these admissions, defense counsel objected to Dr. Snyder's qualification to testify as an expert in this case.[19] The court overruled the objection and ruled that Dr. Snyder was qualified to provide expert testimony in the fields for which he was being offered,

16. N.T., 3/11/98, at 174.
17. N.T., 3/11/98, at 172.
18. N.T., 3/11/98, at 174-75. (emphasis added)
19. N.T., 3/11/98, at 176.

namely mechanical engineering, product design, and failure analysis.[20]

Dr. Snyder twice inspected the ladder and reviewed several publications before formulating an opinion in this case. Dr. Snyder reviewed the *Wood Engineering Handbook* of the U.S. Forest Products Laboratory and other literature.[21] Dr. Snyder based his opinion at trial entirely on the type and characteristics of the wood used in the ladder. Dr. Snyder testified that the ladder was defective because of "the inherent weakness in the design, coupled with the weak characteristics of this wood." [22] He found three reasons for the failure:

"One is, inherently, this is a weak design because of the dedo cut that was talked about before . . . ." [23]

The second reason for failure was the wood itself. The type of wood in the ladder was material to his opinion. He testified in detail about the wood characteristics that caused the failure:

"In addition to the design, the weakness in the design, the wood itself had several characteristics which would make it weaker than a normal piece of wood; one being that . . . [t]his grain deviates from straightness . . . At this corner, this grain deviation exceeds what would be an acceptable slope, and provides another irregularity around this joint (indicating).

"The second thing is . . . [the growth rings] form an ellipse, rather than a circle . . . a normal tree would grow in a circular growth pattern." [24]

---

20. N.T., 3/11/98, at 176-77.
21. N.T., 3/11/98, at 179.
22. N.T., 3/11/98, at 185.
23. N.T., 3/11/98, at 180.
24. N.T., 3/11/98, at 182-83.

Finally, Dr. Snyder concluded that the ladder's weakness was a function of the wood:

"Then the third thing was the choice of lumber cut in this piece . . . the way this wood was cut was actually rift sawn. It was not flat sawn. So that, in fact, also created a weaker piece . . . ." [25]

On cross-examination, defense counsel demonstrated that Dr. Snyder had no expertise in these crucial areas of his opinion.

Dr. Snyder issued three reports in this case. In his first report, Dr. Snyder concluded that the failed right leg of the ladder was Douglas fir and therefore "composed of low density wood." [26] Dr. Snyder based this erroneous conclusion on his inspection of the ladder and "assumption" that the ladder was composed of a strong species of soft wood. [27] Dr. Snyder repeated these erroneous opinions in his second report, which was issued to correct mathematical errors contained in his earlier report.

After reviewing the opinion of defendants' expert, Dr. George H. Kyanka, Dr. Snyder changed his opinion, adopted the defense expert's opinion, and issued a third report. [28] In this third report, Dr. Snyder wrote, "Dr. Kyanka is correct that the species is a variety of southern

---

25. N.T., 3/11/98, at 183.

26. He testified on cross-examination:

"Mr. Toensmeier: In your first report, you said that the wood was Douglas fir, didn't you?

"The Witness: That's what I said in the report, yes.

"Mr. Toensmeier: It's not Douglas fir, is it?

"The Witness: No." N.T., 3/11/98, at 197-98.

27. N.T., 3/11/98, at 198.

28. Dr. Kyanka further concluded that the ladder was not defectively designed and that the wood used in the ladder was not improper. N.T., 3/12/98, at 375-76.

yellow pine." Dr. Snyder still could not determine which variety.[29] In court, Dr. Snyder explained that he changed his opinion of the type of wood involved after he "went back and checked the text, and that was consistent with southern yellow pine." [30] Diametrically opposite his initial conclusion that the ladder was made of "low density wood," Dr. Snyder wrote in his third report that the wood had an "abnormally high" density.[31] Dr. Snyder's third report also stated for the first time that there was evidence of compression wood. However, he never made the investigation necessary to actually identify whether compression wood was present.[32]

Because Dr. Snyder lacked qualification in an area that was crucial to his opinion, defendant Archbold successfully argued on post-verdict motions that Dr. Snyder was unqualified to testify as an expert in this case. The standard in Pennsylvania for qualifying a witness as an expert is incredibly lax. Any individual having "any reasonable pretension to specialized knowledge on the subject under investigation" is qualified to present an opinion to the jury.[33] "[T]he qualification of an expert witness rests within the sound discretion of the trial judge, and . . . absent an abuse of that discretion, the decision of the trial judge should be upheld." [34] Dr. Snyder's training, education, and experience clearly qualified him to testify generally as an expert in the areas of mechanical engineering, product design, and failure analysis.

---

29. N.T., 3/11/98, at 203.

30. N.T., 3/11/98, at 205.

31. N.T., 3/11/98, at 229.

32. N.T., 3/11/98, at 231-32.

33. See *e.g., Miller v. Brass Rail Tavern Inc.*, 541 Pa. 474, 480-81, 664 A.2d 525, 528 (1995).

34. *Id.* at 481, 664 A.2d at 528.

It is essential that a witness' generalized expertise "fit" the precise area of controversy. Nonetheless, highly specialized experts are not required in every case. As the Superior Court stated, "[e]xperts in one area of medicine have been ruled qualified to address other areas of specialization where the specialties overlap in practice, or where the specialist has experience in another related medical field." [35] In *Montgomery v. South Philadelphia Medical Group,* the plaintiff in a medical malpractice action alleged that a physician's assistant was negligent in failing to refer her to a doctor after she complained of breast pain.[36] The plaintiff offered the testimony of a board-certified internist to establish that the physician's assistant breached the applicable duty of care.[37] The Superior Court held: "[a] witness may qualify as an expert if his experience or education logically or fundamentally embraces the subject at issue . . . In the area of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field." [38] The physician was permitted to testify to the applicable standard of care because "[k]nowledge as to the treatment and care of patients which may be possessed by a physician's assistant is

35. *McDaniel v. Merck, Sharp & Dohme,* 367 Pa. Super. 600, 612, 533 A.2d 436, 442 (1987). See also, *Kearns v. Clark,* 343 Pa. Super. 30, 493 A.2d 1358 (1985) (urologist qualified to testify as expert against surgeon who performed hysterectomy, where urologist was familiar with protection of ureters and had assisted in hysterectomies); *Ragan v. Steen,* 229 Pa. Super. 515, 331 A.2d 724 (1974) (doctor who was not radiologist but knew risks of x-ray treatment qualified to testify as expert against radiologist).

36. 441 Pa. Super. 146, 656 A.2d 1385 (1995), *appeal denied,* 542 Pa. 648, 666 A.2d 1057 (1995).

37. *Id.* at 151, 656 A.2d at 1387.

38. *Id.* at 151-52, 656 A.2d at 1388.

also knowledge generally possessed by a medical doctor." [39]

In *Lira v. Albert Einstein Medical Center,* the plaintiff was injured when her doctor inserted a nasogastric tube through her right nostril.[40] The plaintiff's expert, a board-certified neurologist, ruled out any neurological basis for the plaintiff's injury and concluded that the traumatic forcing of the tube caused her injuries. The defense argued that the expert was unqualified to testify because he was not an otolaryngologist.[41] The expert, however, had received training in otolaryngology; accordingly, he was qualified to testify in the area under investigation.

In *Taylor v. Spencer Hospital,* the Superior Court held that the trial court erred in striking the testimony of a doctor who testified to a standard of nursing care.[42] The plaintiff's expert, a medical doctor, testified that "the nursing staff did not take the necessary measures to prevent her [the plaintiff] from getting out of her restraints and going out the window." [43] The Superior Court permitted the testimony because nurses only practice medicine under the supervision of doctors:

"[N]ot allowing a medical doctor to give testimony on the standard of nursing care suggests that nurses are permitted to practice in some areas of medicine from which doctors are excluded." [44]

Thus, since "[a]ll areas of medical expertise within the knowledge of nurses are also within the knowledge

39. *Id.* at 152, 656 A.2d at 1389.

40. 384 Pa. Super. 503, 509, 559 A.2d 550, 553 (1989), *appeal denied,* 527 Pa. 635, 592 A.2d 1302 (1990).

41. Otolaryngology is a specialty dealing with the larynx and trachea.

42. 222 Pa. Super. 17, 22, 292 A.2d 449, 452 (1972).

43. *Id.* at 21, 292 A.2d at 451.

44. *Id.* at 22, 292 A.2d at 452.

of medical doctors," the doctor's testimony on the standard of nursing care was proper.[45]

The Superior Court has also permitted experts to testify on related fields in non-medical cases. In *Whistler Sportswear Inc. v. Rullo,* a civil engineer with no specific expertise in roof design was permitted to testify on the cause of the failure of roof supports.[46] The engineer testified that based upon his inspection, he determined that the collapse was caused by the torque of the support columns. The Superior Court stated that "[t]he fact that [the witness'] area of expertise was not specifically in roof design was by no means a fatal flaw once the *actual impact* of his testimony is reviewed." [47] The expert was not relying on any "knowledge of roofing per se" in forming his opinion but solely on his general engineering background. Therefore, his testimony was not beyond the scope of his expertise as a civil engineer.

Although Pennsylvania's long-standing standard for the qualification of an expert is liberal, it is not unlimited. The witness' "reasonable pretension" must be expertise in the specific area under investigation. Generally acceptable expertise is inadequate where it fails to "fit" the precise issue in question. A witness may be unqualified to testify as an expert "if a witness possesses neither experience nor education in the subject matter under investigation." [48] In *Dambacher by Dambacher*

45. *Id.* at 24, 292 A.2d at 453. Cf. *Flanagan v. Labe,* 446 Pa. Super. 107, 113, 666 A.2d 333, 336-37 (1995) (holding nurse incompetent to provide expert testimony on legal causation where opinion was based on her own unsupported medical diagnosis).

46. 289 Pa. Super. 230, 238, 433 A.2d 40, 44 (1981).

47. *Id.* at 238, 433 A.2d at 44. (emphasis added)

48. *Dierolf v. Slade,* 399 Pa. Super. 9, 13, 581 A.2d 649, 651 (1990). See also, *Steele v. Sheppard,* 411 Pa. 481, 485-86, 192 A.2d 397, 400 (1963) (holding witness having no personal experience

*v. Mallis,* the defense expert, an automobile mechanic, was held unqualified to testify on "vehicle-road dynamics" because he had no training or experience on the subject.[49] The Superior Court recognized that even if the scope of a witness' expertise embraces the subject in a general way, "the subject may be so specialized that . . . the witness will not be qualified to testify." [50] The proffered expert claimed to be "an expert on the effect of mixing tires" because he had experience in road-testing the type of car in question. However, the witness did not know any details about the vehicles he had test-driven.[51] Because of his failure of qualification in vehicle-road dynamics, the witness' self-serving statement that he was an expert was insufficient to qualify him to testify on that issue.

Similarly, in *Dierolf v. Slade,* an orthodontist was found unqualified to express his opinion on the cause of a nerve injury during oral surgery.[52] The proposed expert was a licensed orthodontist, but he "never performed surgery, never observed a peroneal nerve injury, is not a neurologist, is not board certified, and is rarely present in the operating room." [53] Because he failed to demonstrate any expertise in either nerve injuries generally or surgical procedures and lacked relevant training, he was not permitted to testify on the issue in question.

---

with theater seats or carpets was unqualified to testify as expert on cost of repair and replacement).

49. 336 Pa. Super. 22, 37, 485 A.2d 408, 416 (1984), *appeal dismissed,* 508 Pa. 643, 500 A.2d 428 (1985).

50. *Id.* at 43, 485 A.2d at 419.

51. *Id.*

52. 399 Pa. Super. at 13, 581 A.2d at 651.

53. *Id.*

In *McDaniel v. Merck, Sharp & Dohme,* the trial court excluded the testimony of the plaintiff's expert doctor, who specialized in anesthesiology and taught pharmacology at Louisiana State University.[54] After reviewing the doctor's educational and professional background, the Superior Court stated: *"[b]y his own admission,* Dr. Adriani's extensive and impressive pharmacology experience has focused on anesthetics. Although generally familiar with Mefoxin through the literature available, he has never studied nor conducted research on the drug nor reviewed the clinical reports on Mefoxin . . . he had no reasonable pretension to specialized knowledge of the drug." [55]

Accordingly, the Superior Court found the doctor unqualified to express an opinion on whether the antibiotic Mefoxin was the cause of decedent's death, whether the hospital was negligent in supervising its surgical staff, or whether the defendant doctor was negligent in failing to consult specialists.[56] The proposed expert was not properly qualified because his training, education, and experience, while providing general expertise, did not "fit" the question presented for jury determination.

Likewise, in *Marlowe v. Lehigh Township,* the trial court ruled that the plaintiff's proposed expert was unqualified to testify concerning the design of the township's storm drainage system.[57] The witness "conceded that his undergraduate training was in the field of mechanical, not civil, engineering and that his work experience had been primarily as a real estate salesman

---

54. 367 Pa. Super. 600, 610, 533 A.2d 436, 441 (1987), *appeal denied,* 520 Pa. 589, 551 A.2d 216 (1988).

55. *Id.* at 610-11, 533 A.2d at 441. (emphasis added)

56. *Id.* at 611, 533 A.2d at 441-42.

57. 64 Pa. Commw. 587, 441 A.2d 497 (1982).

and developer." [58] Affirming the trial court's preclusion of the testimony, the Commonwealth Court recognized that a witness need not: "possess all of the knowledge within his special field of endeavor. However, a witness who *demonstrates by his own testimony that he has no experience or special knowledge of the matter at issue* is incompetent as an expert." [59]

Without any training or experience in drainage system design, the specific issue in question, the witness' testimony, was properly excluded.

Pennsylvania law permits almost any expert to offer an opinion in any specialized area whenever such opin-

---

58. *Id.* at 593, 441 A.2d at 500. The witness testified to his qualifications as follows:

"Q: Have you ever had any formal training in the design and engineering of water drainage or water runoff systems?

"A: No.

"Q: Your capacity is as a real estate broker. Is that correct?

"A: Well, yes. I have a broker's license but our main business is construction.

"Q: And you hire engineers to develop those systems. Isn't that correct?

"A: That's correct.

"Q: And you don't do any of that yourself?

"A: That's correct.

"Q: And you have no specific qualifications that you can give us here today that show you were in any way trained in the engineering of those systems. Is that correct?

"A: That's right."

Based on these admissions, the trial court precluded him from testifying as an expert on the issue of the drainage system's design. *Id.*

59. *Id.* (emphasis added) See also, *Pratt v. Stein,* 298 Pa. Super. 92, 153, 444 A.2d 674, 706 (1982) (citing *Erschen v. Pennsylvania Independent Oil Co.,* 259 Pa. Super. 474, 477, 393 A.2d 924, 926 (1978)).

ion "will assist" the trier of fact.[60] The only significant limitation is that the witness' expertise be in the specific area under investigation. Where the knowledge overlaps, a witness who is qualified as an expert in a specialized area will be permitted to address related areas of specialization. If the witness has no training or experience in the area under investigation, however, he will not be permitted to proffer expert testimony on that issue.

Accordingly, it is clear that Dr. Snyder was unqualified to provide an expert opinion on the specific issue in this case. Dr. Snyder admitted that he was unqualified to testify as an expert on wood. He admitted to having no specialized knowledge whatsoever on the properties of wood. Dr. Snyder's extensive training and experience in the areas of mechanical engineering, product design, and failure analysis did not encompass the necessary knowledge of wood.

Dr. Snyder's conflicting reports demonstrated this lack of expertise in the relevant field. Dr. Snyder originally concluded that the ladder was composed of Douglas fir. Dr. Snyder was mistaken. He admitted this mistake in his third report, which adopted the defense expert's opinion that the wood was a variety of southern yellow pine.[61] This error was important enough to Dr. Snyder's opinion to require a revised report.[62]

60. Pa. R.E. 702.

61. N.T., 3/11/98, at 201-203.

62. An expert's opinion may be based, in part, on the opinions of other experts. *Foster v. McKeesport Hospital,* 260 Pa. Super. 485, 394 A.2d 1031 (1978). However, an expert may not simply repeat another's opinion or data without bringing to bear on it his own expertise and judgment. *Primavera v. Celotex Corp.,* 415 Pa. Super. 41, 52, 608 A.2d 515, 521 (1992). Dr. Snyder obviously did not apply his own expertise and judgment in determining the type of wood in the ladder. After reading Dr. Kyanka's report, Dr. Snyder simply "went back and checked the text" and found that it was

Although he lacked any expertise on wood, Dr. Snyder improperly based his opinion entirely on the type and characteristics of the wood in the ladder.

Defendant argues that if the court grants its motion for post-trial relief, then defendant is entitled to either judgment n.o.v. or a new trial. In *Dambacher,* the Superior Court recognized that judgment n.o.v. may be the appropriate relief if the court finds the expert's opinion to be equivocal and thus legally insufficient.[63] However, when an expert is found unqualified to express an opinion, "the proper remedy is a new trial, not judgment n.o.v." [64] Because the court found that Dr. Snyder was unqualified to express an opinion on the issue in this case, the only proper remedy is a new trial, which was granted.

Defendant further argues that the court improperly allowed questions of John Hatfield, the former president of Archbold Ladder Company, concerning prior accidents involving defendant. It is basic that evidence of similar accidents occurring at substantially the same place and under the same or similar circumstances may, in the sound discretion of the trial judge, be admissible to prove constructive notice of a defective or dangerous condition and the likelihood of injury. Evidence of prior accidents can be "relevant to show the product was unsafe, to prove causation, and/or to show that a defendant had actual or constructive knowledge of a condition that could cause harm." [65] To be admissible, how-

---

consistent with Dr. Kyanka's conclusion. Not only did Dr. Snyder base his opinion on the type of wood in the ladder, but he changed his "expert" opinion based on the report of defendant's expert.

63. 336 Pa. Super. at 34, 485 A.2d at 414. See also, *Palmer v. Lapp,* 392 Pa. Super. 21, 28, 572 A.2d 12, 16 (1990).

64. *Dambacher,* 336 Pa. Super. at 35, 485 A.2d at 414.

65. *Spino v. John S. Tilley Ladder Co.,* 548 Pa. 286, 293, 696 A.2d 1169, 1172 (1997) (citing *DiFrancesco v. Excam Inc.,* 434

ever, the prior accidents must be sufficiently similar to the plaintiff's accident.[66] Prior to Mr. Hatfield's testimony, defense counsel argued that the prior accidents were not substantially similar to the accident in this case.

By offer of proof, plaintiffs introduced two prior cases involving defendant Archbold that they claimed were substantially similar to the instant case. The first case was *Smith v. Archbold Ladder Company.* In that matter, the plaintiff alleged that the right leg of a ladder manufactured by defendant Archbold fractured below the first step. Plaintiffs' counsel argued that *Smith* was relevant to this case because there was an identical fracture in the right front leg.[67] The second case was *McCullough v. Archbold Ladder Company,* where the plaintiff allegedly "fell from the ladder because of the use of defective wood that caused the ladder to break." [68] Plaintiffs' counsel argued that evidence of similar accidents was relevant to show existence of the defect, causation, and notice. The accidents in both *Smith* and *McCullough* involved a fracture of the right leg of a wooden Archbold ladder below the first step, nearly identical to the fracture in this case. Following argument on the issue, the court overruled the objection and permitted Mr. Hatfield's testimony.[69] Because the incidents were substantially

---

Pa. Super. 173, 185, 642 A.2d 529, 535 (1994), *appeal dismissed,* 543 Pa. 627, 674 A.2d 214 (1996)).

66. *Id.* See also, *Majdic v. Cincinnati Machine Co.,* 370 Pa. Super. 611, 623, 537 A.2d 334, 340 (1988) (holding evidence of prior accidents inadmissible where plaintiff failed to demonstrate that they were sufficiently similar to plaintiff's accident), *appeal denied,* 520 Pa. 594, 552 A.2d 249 (1988).

67. N.T., 3/11/98, at 125.

68. N.T., 3/11/98, at 127.

69. N.T., 3/11/98, at 129-30.

similar, the admission of this evidence was not reversible error.

For the foregoing reasons, the court properly granted defendant's motion for post-trial relief and ordered a new trial. The ruling of the court should be affirmed.